Walter J. HICKEL, Governor of the State of Alaska, Darrel J. Rexwinkel, Commissioner of the Department of Revenue for the State of Alaska, and the State of Alaska, Petitioners and Cross–Respondents,

v.

Steve COWPER, Respondent and Cross–Petitioner.

Nos. S–6294, S–6304.

Supreme Court of Alaska.

May 27, 1994.

James L. Baldwin, Stephen C. Slotnick, Juneau, Jenifer A. Kohout, Anchorage, Asst. Attys. Gen., and Bruce M. Botelho, Atty. Gen., Juneau, for petitioners and cross-respondents.

Douglas Pope, Thomas A. Ballantine, Wagstaff, Pope & Katcher, Anchorage, for respondent and cross-petitioner.

Before MOORE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ., and BRYNER, J. Pro Tem.*

MATTHEWS, Justice.

## OPINION

In *Hickel v. Halford,* 872 P.2d 171 (1994) (*Halford*), we addressed the meaning of the term "administrative proceeding" as used in article IX, section 17 of the Alaska Constitution.[1] This is one of the terms which describes state revenues which must be deposited into the budget reserve fund. We are now required to interpret several other key terms of section 17, including "amount available for appropriation" and "amount appropriated for the previous fiscal year." § 17(b). These terms govern the legislature's ability to withdraw from the budget reserve fund by a simple majority vote.

This case arises out of a legislative attempt to define these terms. While final decision in *Halford* was pending, the Alaska Legislature passed and Governor Hickel signed Senate Committee Substitute for Committee Substitute for House Bill 58 (FIN) (the Act). Chapter 5, SLA 1994. Section 1 of the Act amends AS 37.10 by adding new sections AS 37.10.410 and .420. Alaska Statute 37.10.410 defines what money is received as a result of the termination of an administrative proceeding under article IX, section 17(a) of the Alaska Constitution. Alaska Statute 37.10.-420 defines several other key phrases and concepts used in section 17, including "amount available for appropriation," "amount appropriated for the previous fiscal year," and "amount of appropriations made in the previous calendar year for the previous fiscal year." Alaska Statute 37.10.420 also establishes the means by which appropriations from the budget reserve fund are

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. Article IX, section 17 provides as follows:
   **Budget Reserve Fund.** (a) There is established as a separate fund in the State treasury the budget reserve fund. Except for money deposited into the permanent fund under Section 15 of this article, all money received by the State after July 1, 1990, as a result of the termination, through settlement or otherwise, of an administrative proceeding or of litigation in a State or federal court involving mineral lease bonuses, rentals, royalties, royalty sale proceeds, federal mineral revenue sharing payments or bonuses, or involving taxes imposed on mineral income, production, or property, shall be deposited in the budget reserve fund. Money in the budget reserve fund shall be invested so as to yield competitive market rates to the fund. Income of the fund shall be retained in the fund. Section 7 of this article does not apply to deposits made to the fund under this subsection. Money may be appropriated from the fund only as authorized under (b) or (c) of this section.

   (b) If the amount available for appropriation for a fiscal year is less than the amount appropriated for the previous fiscal year, an appropriation may be made from the budget reserve fund. However, the amount appropriated from the fund under this subsection may not exceed the amount necessary, when added to other funds available for appropriation, to provide for total appropriations equal to the amount of appropriations made in the previous calendar year for the previous fiscal year.

   (c) An appropriation from the budget reserve fund may be made for any public purpose upon affirmative vote of three-fourths of the members of each house of the legislature.

   (d) If an appropriation is made from the budget reserve fund, until the amount appropriated is repaid, the amount of money in the general fund available for appropriation at the end of each succeeding fiscal year shall be deposited in the budget reserve fund. The legislature shall implement this subsection by law.

repaid.[2] Section 2 of the Act states that the provisions of section 1 "are declaratory of existing law and represent the intent of the legislature when the Sixteenth Alaska State Legislature passed [the resolution proposing the constitutional amendment creating section 17]." Ch. 5 SLA 1994.

Following passage of the Act, the current respondent and cross-petitioner, former Governor Steve Cowper, applied to this court for a limited remand in the pending *Halford* case so that he could challenge the constitutionality of the Act.[3] Petitioners and cross-respondents, Governor Walter J. Hickel, Commissioner of Revenue Darrel J. Rexwinkel, and the State of Alaska (hereafter referred to as the State), applied to this court for original jurisdiction to consider the constitutionality of the Act. We granted a limited remand to the superior court so that Gov. Cowper could move to amend his complaint in order to challenge the constitutionality of the Act.[4]

On remand, the consolidated cases were severed and Gov. Cowper was allowed to amend his complaint to allege that the Act was unconstitutional. He then moved for partial summary judgment on this question. The State also moved for a partial summary judgment declaring the Act constitutional. The superior court granted expedited consideration of the summary judgment motions. Following briefing and oral argument, the court declared the Act unconstitutional on April 8, 1994.[5] In a written decision the superior court held that AS 37.10.420 is unconstitutional because it unduly limits the funds counted as available for appropriation. The court explained that "[i]f a simple majority vote can withdraw the funds ... it is

2. AS 37.10.420 provides:
(a) For purposes of applying art. IX, sec. 17(b), Constitution of the State of Alaska,
(1) "the amount available for appropriation" or "funds available for appropriation" means
(A) the unrestricted revenue accruing to the general fund during the fiscal year;
(B) general fund program receipts as defined in AS 37.05.146;
(C) the unreserved, undesignated general fund balance carried forward from the preceding fiscal year that is not subject to the repayment obligation imposed by art. IX, sec. 17(d), Constitution of the State of Alaska; and
(D) the balance in the statutory budget reserve fund established in AS 37.05.540;
(2) "the amount appropriated for the previous fiscal year" means the amount appropriated from the
(A) constitutional budget reserve fund under the authority granted in art. IX, sec. 17, Constitution of the State of Alaska; and
(B) same revenue sources used to calculate the money available for appropriation for the current fiscal year; and
(3) "the amount of appropriations made in the previous calendar year for the previous fiscal year" means appropriations made from sources identified in (2) of this subsection for a fiscal year that were enacted during the calendar year that ends on December 31 of that same fiscal year.
(b) If the amount appropriated from the budget reserve fund has not been repaid under art. IX, sec. 17(d), Constitution of the State of Alaska, the Department of Administration shall transfer to the budget reserve fund the amount of money comprising the unreserved, undesignated general fund balance to be carried forward as of June 30 of the fiscal year, or as much of it as is necessary to complete the repayment. The transfer shall be made on or before December 16 of the following fiscal year.
(c) In this section, "unrestricted revenue accruing to the general fund" or "unreserved, undesignated general fund balance carried forward" is money not restricted by law to a specific use that accrues to the general fund according to accepted principles of governmental or fund accounting adopted for the state accounting system established under AS 37.05.150 in effect on July 1, 1990.
(d) An appropriation under art. IX, sec. 17(b), Constitution of the State of Alaska, requires an affirmative vote of the majority of the members of each house of the legislature. An appropriation under art. IX, sec. 17(c) requires an affirmative vote of three-fourths of the members of each house of the legislature.

3. See *Halford*, 872 P.2d at 174–76, for a full statement of the earlier proceedings in this case.

4. This court does not possess original jurisdiction over the case. AS 22.05.010. In addition, no Alaska court could normally adjudicate an action by the State seeking to have a statute declared constitutional, in the absence of the willing participation of a truly adverse party. *See Greater Anchorage Area Borough v. City of Anchorage*, 504 P.2d 1027, 1036 (Alaska 1972) ("Parties seeking a judicial determination of a hypothetical, advisory or moot question will be denied relief.").

5. The superior court found AS 37.10.410 unconstitutional based on an inconsistency between the statute and this court's interpretation of the term "administrative proceeding" in *Halford*. The State does not challenge this portion of the court's decision in this petition.

available for appropriation ... [unless] it belongs to someone else ... or would not be there without the purpose and permission of the source." The superior court also ruled that AS 37.10.420(b), which provides for repayment of funds appropriated out of the budget reserve, unconstitutionally limits the source of these funds. The superior court did not attempt to identify which funds were and were not available for appropriation under section 17(b).

The State petitioned this court for emergency review of the superior court's decision with respect to AS 37.10.420. Gov. Cowper cross-petitioned on the same issue. We granted both petitions. After expedited briefing, we heard oral argument on April 22, 1994.

## I. *STANDARD OF REVIEW*

The State argues that this court should defer to the legislature's interpretation of section 17. The State bases this argument on a "strong presumption" in favor of legisla-

**6.** *See Heckendorn v. City of San Marino,* 42 Cal.3d 481, 229 Cal.Rptr. 324, 327, 723 P.2d 64, 67 (1986) ("We must determine what the term 'ad valorem tax' means in Article XIII A."); *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization,* 22 Cal.3d 208, 149 Cal.Rptr. 239, 257, 583 P.2d 1281, 1300 (1978) (en banc) (discussing rules of construction used by courts in interpreting constitutional provisions); *State ex rel. Udall v. Colonial Penn Ins. Co.,* 112 N.M. 123, 812 P.2d 777, 782–83 (1991) ("We interpret our constitution to carry out its spirit."); *Coronado Oil Co. v. Grieves,* 603 P.2d 406, 411 (Wyo.1979) ("Though the legislature's interpretation of the constitution is not binding on the supreme court, we would be loath to interpret the constitution otherwise. We must give weight to legislative interpretation, though not conclusive.") (citations omitted).

**7.** The legislature's interpretation of the constitutional terms at issue in this case may be considered more persuasive than otherwise because of its greater familiarity with appropriations. Deference in such circumstances is at most, however, a single tool for use by this court in interpreting the constitution. If the legislature adopted AS 37.10.420 contemporaneously with its approval of the Legislative Resolve No. 129 (eventual Article IX, section 17), that would be considered a significant indication of the actual meaning of section 17. A statement by the Eighteenth Legislature of the intent of the Sixteenth Legislature would not bear great weight even if the subject was the meaning of a statute; the applicable degree of deference is lessened by the fact

tive interpretations, *State ex rel. Udall v. Colonial Penn Ins. Co.,* 112 N.M. 123, 812 P.2d 777, 783 (1991), and the presumption that statutes are constitutional, *Bonjour v. Bonjour,* 592 P.2d 1233, 1237 (Alaska 1979). Further, the disputed terms in section 17(b) involve appropriations, and the power to appropriate is wholly legislative, Alaska Const. art. IX, § 13. The State misconstrues the applicable standard of review.

The cases cited by the State do not support the proposition that courts should defer to legislative interpretations of ambiguous constitutional provisions. On the contrary, in each of the cases cited by the State, the court clearly is engaged in interpreting the constitutional provision.[6] Nor does the legislature's role in making appropriations somehow alter or increase its authority to define constitutional terms merely because the terms contain the word "appropriation." This court retains the same power to interpret constitutional terms regardless of the subject matter of the term.[7]

that at issue is the meaning of a constitutional amendment for which the legislature is not the ultimate adopting authority. Our discussion of the weight to be afforded a subsequent legislative statement of the meaning of an earlier statute in *Hillman v. Nationwide Mut. Fire Ins. Co.,* 758 P.2d 1248, 1252–53 (Alaska 1988), is relevant here.

> While the legislature is fully empowered to declare present law by legislation, it is not institutionally competent to issue opinions as to what a statute passed by an earlier legislature meant. If the legislature were in some form to declare its opinion as to the meaning of prior law, that declaration would be entitled to the same respect that a court would afford to, for example, an opinion of a learned commentator; that is, the court would examine the reasoning offered in support of the opinion and either reject or accept it based on the merit of the reasons given.... It is possible to argue that the legislature has knowledge superior to a disinterested commentator because there may be some legislators in the current legislature who were also members of the legislature which passed the prior law and thus have special insight into the intent of the legislature. However, the force of this is dispelled when one considers that it is not permissible to allow a legislator to testify on the question of his unexpressed legislative intent or on the unexpressed legislative intent of others.

*Id.* (citing *Kenai Peninsula Borough Sch. Dist. v. Kenai Peninsula Educ. Ass'n,* 572 P.2d 416 (Alaska 1977)).

■ This court's task, therefore, is identical to that faced whenever a statutory enactment is claimed to run afoul of a constitutional provision. "Questions concerning the constitutionality of a statute are questions of law and are reviewed *de novo.*" *Sun v. State,* 830 P.2d 772, 775 n. 4 (Alaska 1992). We must first determine what the constitution actually means. The proper interpretation of a constitutional provision is a question of law to which this court applies its independent judgment. *Arco Alaska, Inc. v. State,* 824 P.2d 708, 710 (Alaska 1992). We then examine the statute to see whether it conflicts with the constitutional requirement. "[S]tatutes should be construed if reasonably possible to avoid the conclusion that they are unconstitutional." *Sonneman v. Hickel,* 836 P.2d 936, 940 (Alaska 1992).

The appropriate approach to interpreting language in the Alaska Constitution is well established. "Constitutional provisions should be given a reasonable and practical interpretation in accordance with common sense. The court should look to the plain meaning and purpose of the provision and the intent of the framers." *Arco Alaska,* 824 P.2d at 710; *see also Kochutin v. State,* 739 P.2d 170, 171 (Alaska 1987).

Because of our concern for interpreting the constitution as the people ratified it, we generally are reluctant to construe abstrusely any constitutional term that has a plain ordinary meaning. Rather, absent some signs that the term at issue has acquired a peculiar meaning by statutory definition or judicial construction, we defer to the meaning the people themselves probably placed on the provision. Normally, such deference to the intent of the people requires "[a]dherence to the common understanding of words."

*Citizens Coalition for Tort Reform, Inc. v. McAlpine,* 810 P.2d 162, 169 (Alaska 1991) (citations omitted) (quoting *Division of Elections v. Johnstone,* 669 P.2d 537, 539 (Alaska 1983)).

## II. DISCUSSION

### A. "Amount Available for Appropriation"

■ The primary issue in this case is the meaning of the term "amount available for appropriation" as used in article IX, section 17(b) of the Alaska Constitution.[8] The State asserts, in accordance with the definition set forth in AS 37.10.420(a)(1), that the "amount available for appropriation" consists only of 1) unrestricted revenue accruing to the general fund during the fiscal year; 2) general fund program receipts as defined in AS 37.-05.146;[9] 3) the unreserved, undesignated

---

8. As preliminary matters, Gov. Cowper argues that the statutes are invalid irrespective of their substantive content because (1) they violate the separation of powers doctrine; (2) they constitute an impermissible attempt by the legislature to influence an ongoing judicial controversy; (3) they intrude on the judicial realm of constitutional interpretation; and (4) the statute violates article IX, section 7's prohibition against dedicated funds. The "influencing" claim pertains entirely to AS 37.10.410 and therefore is not relevant to the present petitions which deal exclusively with AS 37.10.420. The "intrusion on the judicial realm" argument is without merit.

Gov. Cowper's argument that the Act establishes a dedicated fund is also without merit. Although the Act defines certain funds as not available for appropriation under section 17(b), it does not prohibit the executive branch from requesting that these funds be reassigned to different purposes or the legislative branch from allocating these funds differently. *Sonneman v. Hickel,* 836 P.2d 936, 940 (Alaska 1992). In addition, because the Act does not dedicate any state revenue to any particular fund, it cannot implicate the prohibitions of section 7. There-

fore, these funds are not made dedicated funds by virtue of the Act.

9. AS 37.05.146 provides:

In AS 37.05.142—37.05.146 and AS 37.07.080, "program receipts" means fees, charges, income earned on assets, and other state money received by a state agency in connection with the performance of its functions; all program receipts except the following are general fund program receipts:

(1) federal receipts;

(2) University of Alaska receipts (AS 14.40.-491);

(3) individual, foundation, or corporation gifts, grants, or bequests that by their terms are restricted to a specific purpose;

(4) receipts of the following funds:

(A) highway working capital fund (AS 44.-68.210);

(B) correctional industries fund (AS 33.32.-020);

(C) loan funds;

(D) international airport revenue fund (AS 37.15.430);

general fund balance carried forward from the preceding fiscal year; and 4) the balance in the statutory budget reserve fund, AS 37.05.540. In addition to the program receipts excluded under AS 37.05.146, this definition excludes the funds listed in AS 37.05.-146, several other funds which have been established by the legislature,[10] and the surplus assets of public corporations.[11] Gov. Cowper argues that the "amount available for appropriation" includes the total amount accessible by the legislature, including all of the funds and assets referred to above. Under this argument, funds are available for appropriation so long as a simple majority can make the funds available.

We reject both interpretations. The text of section 17 cannot support the State's narrow interpretation. However, Gov. Cowper's position would require a complete restructuring of the established financial system of the state government. We are unwilling to add "missing terms" to the Constitution or to interpret existing constitutional language more broadly than intended by the framers or the voters. Instead, we consider it appropriate, as well as consistent with both the language of the amendment and the intent of the framers, to focus on the legal status of the various funds implicated in relationship to the legislative power of appropriation. The "amount available for appropriation" must include all funds over which the legislature has retained the power to appropriate and which are not available to pay expenditures without further legislative appropriation. It must also include all amounts which the legislature actually appropriates for the fiscal year, whether or not they could have been considered available prior to the appropriation.

Our analysis of a constitutional provision begins with, and remains grounded in, the words of the provision itself. We are not vested with the authority to add missing terms or hypothesize differently worded pro-

(E) funds managed by the Alaska Housing Finance Corporation (AS 18.56.020), the Alaska Railroad Corporation (AS 42.40.010), the Municipal Bond Bank Authority (AS 44.85.-020), the Alaska Aerospace Development Corporation (AS 14.40.821), or the Alaska Industrial Development and Export Authority (AS 44.88.020);

(F) fish and game fund (AS 16.05.100);

(G) school fund (AS 43.50.140);

(H) training and building fund (AS 23.20.-130);

(I) retirement funds (AS 14.25, AS 22.25, AS 26.05.222, AS 39.35, and former AS 39.37);

(J) permanent fund (art. IX, sec. 15, Alaska Constitution);

(K) public school fund (AS 37.14.110);

(L) second injury fund (AS 23.30.040);

(M) fishermen's fund (AS 23.35.060);

(N) FICA administration fund (AS 39.30.-050);

(O) receipts of the employee benefits program established under AS 39.30.150—39.30.-180;

(P) receipts of the deferred compensation program established under AS 39.45;

(Q) clean air protection fund (AS 46.14.260);

(R) receipts of the group insurance programs established under AS 39.30.090.

(5) receipts of or from the trust established by AS 37.14.400—37.14.450, except reimbursements described in AS 37.14.410.

10. These additional funds include the Railbelt energy fund, AS 37.05.520, the Alaska marine highway system vessel replacement fund, AS 37.-05.550, the educational facilities maintenance and construction fund, AS 37.05.560, the oil and hazardous substance release response fund, AS 46.08.010, the power cost equalization and rural electric capitalization fund, AS 42.45.100, the power project fund, AS 42.45.010, the Alaska science and technology endowment, AS 37.17.-020, and the permanent fund earnings reserve account, AS 37.13.145.

11. In 1985, the Department of Law issued an informal opinion, written by Assistant Attorney General James L. Baldwin, which concluded that "unrestricted money in the [Alaska Housing Finance Corporation] revolving fund is probably *available for appropriation.*" 1985 Informal Op. Att'y Gen. 307 at 309 (emphasis added). The Opinion recommended that the statute governing the Alaska Housing Finance Corporation (AHFC) be amended to specifically authorize interim transfers of unrestricted surplus assets of AHFC to the general fund and to provide that the board of directors annually determine the amount of surplus available for transfer. *Id.* at 310–11.

The statutes governing the AHFC and the Alaska Industrial Development and Export Authority (AIDEA) now require each organization to annually determine whether it has assets in excess of the amount required to fulfill its purposes. *See* AS 18.56.089(b)(1); AS 44.88.205(b)(1). Each organization must present this determination to the legislature by January 10 of each year. AS 18.56.089(b)(2); AS 44.88.205(b)(2); *See* Ch. 12 SLA 1991.

visions in order to reach a particular result.[12] Our task is to identify the meaning that the people probably placed on the term. *Halford*, 872 P.2d at 176. The dictionary definitions of the controlling words "amount" and "available" provide a helpful starting point. *Webster's Third New International Dictionary* defines "amount" as "a: the total number or quantity . . .; b: the sum of individuals . . .; c: the quantity at hand or under consideration." *Id.* at 72. Relevant definitions of "available" are "3: such as may be availed of: capable of use for the accomplishment of a purpose: immediately utilizable . . .; 4: that is accessible or may be obtained . . .: at disposal esp. for sale or utilization." *Id.* at 150.

From similar dictionary definitions, Gov. Cowper paraphrases "amount available for appropriation" as meaning "the total funds accessible by the legislature for appropriation." He further interprets this paraphrase as meaning that all funds which the legislature can make available to itself by a majority vote, whatever their current use or designation, are "available for appropriation."[13] At the outer limits, this construction would require that all net assets held by the State, however liquid, be considered available in determining whether the amount available was less than the amount appropriated for the previous year.[14] Such an expansive reading of the constitutional language would render section 17(b) superfluous for all practical purposes.[15] It would also involve the adoption of a radically different approach to government financing. Neither result is consistent with the purpose of the amendment, the intent of the framers, or extrinsic indications of the voters' probable understanding of section 17's terms.

Section 17(b) allows a simple legislative majority to use the constitutional budget reserve fund in order to make up the difference between the "amount available for appropriation" for a given fiscal year and the "amount appropriated for the previous fiscal year." If net state assets are included in the total amount available, then they would have to be actually expended before the budget reserve fund could be reached by a simple majority to keep spending at a constant level. Even if we consider only net assets which exist in a cash form—such as the balances contained in

12. On this basis alone, we must reject the State's plea to convert the term "amount available for appropriation," as used in section 17(b), to either "amount available for appropriation from the [unrestricted] general fund" or "revenues available for appropriation." If the definition of "amount available for appropriation" in AS 37.-10.420 is to withstand constitutional scrutiny, it must be because it is in conformity with the text of section 17(b), and not because section 17(b) is missing words which would make it conform to AS 37.10.420.

13. The State argues that the "common understanding" of the phrase "available for appropriation" is more limited. It states that the term should have the same meaning in the Constitution that it has in the budget process, meaning only "revenue sources customarily considered by the legislature." The State asserts that only unrestricted revenues are so considered. To be distinguished are "restricted revenues," the use of which is restricted in some way, usually by the source of the funds, predominantly the federal government.

The State never asserts or shows evidence, however, that the term "available for appropriation" is actually used in any particular way in the budget process. Rather, it argues that the term "should be interpreted with reference to revenue sources customarily considered by the legislature

when it considers the state budget." It is also not clear that the legislative definition of "amount available for appropriation" includes all monies "customarily considered by the legislature." Although it probably does include all *revenues* customarily considered, it may not include all amounts so considered.

14. Gov. Cowper does limit his argument to cash funds, presumably because of the relative ease with which cash funds can be converted to different purposes, as compared to illiquid assets. This is a reasonable limitation. Although we have held, in a different context, that property other than money may be "appropriated," *see McAlpine v. University of Alaska*, 762 P.2d 81, 87–89 (Alaska 1988), it does not follow that it is necessarily "available for appropriation" within the meaning of section 17(b).

There does not appear to be any significant difference, however, in the type of legislative action necessary to reach cash funds and less liquid state assets. Gov. Cowper's interpretation therefore recognizes that "available," as used in section 17(b), requires more than mere accessibility.

15. Under this interpretation, if state assets are in excess of annual appropriations, even a total lack of revenue would not allow a simple majority to withdraw from the budget reserve fund.

any one of the State's several revolving loan funds [16]—the existing state programs dependent on these funds would have to be curtailed if these funds were expended on another purpose. These funds are maintained, however, because in the judgment of the legislature they serve worthwhile purposes. Therefore, one of the uses the legislature presumably would want to make of the newly available money would be to reestablish these funds. Yet, to the extent that any of these funds were started and funded before the previous year, there would not be an equivalent appropriation in the previous year to balance out the appropriation required in the present year. Gov. Cowper's interpretation of section 17(b)'s majority access formula would, in effect, require reductions in the level of government service until no liquid funds remained before a simple majority could reach the budget reserve.

One of the purposes of the budget reserve amendment, however, was to provide a "stabilizing mechanism" in the budgetary process.[17] The formula in section 17(b), which compares funds currently available to the amount appropriated for the previous fiscal year, and allows simple majority appropriation from the budget reserve fund to the extent necessary "to provide for total appropriations equal to the amount of appropriations made in the previous calendar year for the previous fiscal year," Alaska Const. art. IX, § 17(b), reflects this purpose and clearly anticipates use of the budget reserve fund to maintain "equal" appropriation levels from year to year. Gov. Cowper's interpretation is inconsistent with this purpose because it would only allow simple majority access to the budget reserve fund if all state programs involving cash funds were eliminated or if

state spending were reduced by the total amount retained in such funds.

Similarly, both the legislative history of section 17 and extrinsic evidence of the voter's understanding of the amendment's provisions indicate that elimination of state services and/or liquidation of state assets was not considered a necessary prerequisite to simple majority access to the budget reserve. Both Representative Rieger and Representative Brown stated in committee that if revenues declined, a simple majority could appropriate from the fund to make up the difference.[18] Statements in the voter pamphlet indicated similar conditions to appropriation. The statement in support of the amendment in the voter pamphlet states:

> The Legislature will be able to spend money from the Budget Reserve only if:
>
> ● revenues are less than the amount appropriated the previous year, in which case money could be appropriated from the Budget Reserve in an amount not to exceed the shortfall[.]

. . . . .

> At the very least, this ballot measure will establish a savings account that can help minimize the effects of a "boom" one year, and a "bust" the next.

The statement in opposition expresses a similar understanding:

> Under paragraph (b) of the proposed constitutional change, a simple majority in the legislature could "borrow" funds from the reserve, to make up any shortfall in revenues, up to the amount appropriated in the previous year.

(Emphasis eliminated.)

These statements demonstrate that Gov. Cowper's expansive reading of "amount avail-

---

16. *See, e.g.,* AS 03.10.040 (agricultural revolving loan fund); AS 14.43.090 (scholarship revolving loan fund); AS 14.43.630 (teacher scholarship revolving loan fund); AS 16.10.340 (commercial fishing revolving loan fund); AS 42.45.010 (power project fund); AS 42.45.250 (bulk fuel revolving loan fund); AS 44.29.210 (alcoholism and drug abuse revolving loan fund); AS 44.88.400 (small business economic development revolving loan fund); 45.95.060 (small business revolving loan fund); AS 45.98.010 (historical district revolving loan fund).

17. *See, e.g.,* Testimony of budget officer Mary Halloran, House Finance Comm. TR. 37, May 1, 1990.

18. *See* Statement of Rep. Rieger, H. Finance Comm., HFC tape 90–97, tr. at 31 (May 3, 1990) ("[I]f oil prices went to $9, it would take a simple majority to use the Budget Reserve Fund to bring you back to what you had last year."); Statement of Rep. Brown, *Id.* at 30 ("[T]o get back to last year's spending level, a simple majority could appropriate from the budget reserve.").

able for appropriation" is not consistent with the purpose of the amendment or the probable understanding of the drafters and voters.

On the surface, these statements may appear to support the State's interpretation of "amount available for appropriation" as including only revenues received by the State within the fiscal year.[19] This interpretation is, however, plainly inconsistent with the language of section 17(b). If the drafters of the amendment had intended that a decline in revenues alone would trigger access, it would have been easy to formulate a test which compared current revenues to prior revenues. The formula in section 17(b), however, compares the "amount available for appropriation" to the amount previously appropriated. In order to accept the various secondary indications of the people's possible understanding as dispositive, it would be necessary to read "amount available for appropriations" as meaning only current revenue. Yet it is clear that in the normal functioning of state government, other funds are routinely available including, at a minimum, the general fund balance carried forward. Nor is an understanding that the reserve fund could be reached by a simple majority when revenues decline necessarily inconsistent with requiring some standing funds to be considered available for appropriation. The State concedes that the statutory budget reserve and the general fund balance would have to be considered available. *See* 37.10.420(a)(1)(C)–(D). Eliminating even these funds from the calculation would allow majority access to the budget reserve whenever there was even the slightest decline from year to year in revenues, even if in the prior year a huge sum was left unappropriated or placed in the statutory budget reserve. The language of sec-

tion 17 and the purposes behind the establishment of the fund do not support such easy access.

The flaw in Gov. Cowper's analysis of the text of section 17(b) is in his assumption that "available" can only mean "accessible by any means." The dictionary definitions of the word indicate narrower meanings which are more consistent with the purpose and intent of the provision and with the probable understanding of the voters. As quoted above, one of the definitions of "available" is "immediately utilizable," indicating that the ease with which funds may be accessible is a factor in determining their availability. This is in accord with a common sense understanding of section 17. As demonstrated above, the purpose and common understanding of the language in section 17(b) allows the budget reserve to be used by a simple majority as necessary to maintain state appropriations at a constant level. Although all funds might be available by some means, counting funds already validly appropriated to a specific purpose as still "available" would disrupt existing state programs and would constitute an inflexible constitutional intrusion on the legislature's authority to evaluate the wisdom of particular appropriations. Although such a constitutional intrusion is conceivable, we are unwilling to read it into a provision with quite a different purpose.

It is far more reasonable to interpret "amount available for appropriation" in light of the relative consequences of and circumstances attendant in making appropriations from different sources. In this light, monies which already have been validly committed by the legislature to some purpose should not

---

**19.** The State asserts that this reading is further supported by newspaper descriptions of the amendment prior to the 1990 general election. Some of the statements in these articles do support the State's position:

> If State revenues decline, money could be taken out to fill the gap. For example, let's say our state earned $2.5 billion in fiscal year 1995. For some reason, such as a drop in production or a drop in price, we earned just $1.5 billion in fiscal year 1996. The legislature could tap into the Budget Reserve Fund to make up the gap.

"Vote Yes on Ballot Measure No. 1," *Fairbanks Daily News–Miner*, Nov. 2, 1990, at 4; *see also* John Enders, "Cowper pushes for economic stability in form of state budget reserve fund," *Juneau Empire*, Oct. 25, 1990, at 3; John Enders, "Budget Reserve–Account Would Cushion State Revenue," *Anchorage Daily News*, Oct. 28, 1990, at M16; John Enders, "Ballot measure would set up budget reserve," *Fairbanks Daily News–Miner*, Oct. 22, 1990, at 6 ("[I]f state revenues fell from one year to the next the Legislature could tap the reserve to make up the difference."). These articles cannot, however, control over contrary wording in the constitution.

be counted as available.[20] In addition, illiquid assets owned by the state are not available so long as they remain illiquid. Given the "stabilizing" purpose of the amendment, it would make little sense to interpret section 17 as requiring the costly and time-consuming process of liquefying state assets before allowing majority access to the constitutional budget reserve fund. *See supra* note 14. The "amount available for appropriation" would include, however, all monies from which the legislature can make an appropriation and which require a legislative appropriation before they can be expended, as well as any amount which would not otherwise be counted as "available" but from which the legislature does in fact appropriate. This interpretation is consistent with the stabilizing purpose of section 17 and with the extrinsic evidence of the voter's understanding of the amendment. Most importantly, it is consistent with the text of section 17(b), as it is based on a reasonable and practical interpretation of the words of that section, in accordance with common sense.[21]

This definition necessarily includes all amounts which are in fact appropriated for a fiscal year, including "trust receipts." [22] There is nothing in the text or history of section 17 which would justify classifying money actually appropriated as *unavailable* for appropriation.[23]

The State argues that "[s]ound policy" requires that these trust receipts be excluded because they "are not available for discretionary appropriation by the legislature." Even if we were to agree that policy considerations favored a system which compared only amounts available for discretionary appropriation to the previous year's appropriations from such amounts, we could not impose that policy choice on a differently worded constitutional provision.

Moreover, it is not clear that excluding these receipts would constitute a better policy. The appropriations made from these receipts represent a significant portion of state spending. The purposes to which these funds are restricted include many core state government functions, including education,

**20.** To do otherwise would be to continue to count sums of money as "available for appropriation" after they have been appropriated, so long as they have not been paid out or converted from cash to some other type of asset. Instead, we recognize that any given sum of money can only be appropriated once during a given time period. Of course, if an appropriation lapses or if the legislature does in fact reappropriate money from an excluded fund to another purpose, it is no longer necessary to exclude that money from the "amount available for appropriation" in order to protect the legislature's authority to make such decisions.

**21.** This interpretation is related to the State's argument that AS 37.10.420 properly excludes "restricted funds" because those funds, at least in part, have already been appropriated. We reject, however, the State's conception of relevant fund restrictions and the State's definition of when an amount has been validly appropriated. Therefore, our definition of the "amount available for appropriation" includes several funds excluded by the statutory definition.

**22.** "Trust receipts" include all funds, whatever the source, which the State can only use for a specific stated purpose under applicable law. The largest "trust receipt" category is federal funding, which may only be appropriated by the State for the purposes prescribed by the federal government. Private entities may also grant the

State money to use for specific purposes. State appropriations from trust accounts, such as the Public Employees Retirement Fund, for purposes relating to the trust, such as fund administration, are also properly characterized as trust receipts. Although the amount of the appropriation is apparently set by the legislature, it must be made in accordance with trust principles. Therefore, the amount which the legislature appropriates in accordance with trust principles is the amount available to the legislature for such appropriation. Finally, amounts appropriated by the legislature out of other funds within executive agencies for purposes of administering these funds, under explicit statutory authority, may also be treated as a type of trust receipt. *See, e.g.,* AS 03.10.040(b) (agricultural revolving loan fund); AS 16.10.340 (commercial fishing revolving loan fund); AS 45.95.060(*o*) (small business revolving loan fund). Although these funds are not trust funds, the statutes do limit legislative authority to appropriate from them.

**23.** Money appropriated from the AHFC and the AIDEA therefore must be counted as available for appropriation. However, money which either organization determines to be in excess of the amount required to fulfill its purposes, see AS 18.56.089(b)(1); AS 44.88.205(b)(1), should not be counted unless actually appropriated to another purpose or transferred to the general fund. The statutes do not automatically transfer these funds out of the respective organizations.

health, social services, public safety, and transportation. *See* State of Alaska, Dep't of Revenue, *Revenue Sources Book* (Fall 1993) at 54 (listing historical grants-in-aid by category). Because these funds are an integral part of the State's annual spending, changes in the amounts received would certainly affect other budget decisions. Policy considerations therefore appear to favor including trust receipts in the amount available, so that, for example, declines in federal funding might result in increased access to the budget reserve fund. The budget reserve amendment does anticipate that all budget decisions be made in relation to one another. We need not choose between these alternative policies, however. Regardless of which policy argument is in fact more compelling, the text of section 17(b) clearly requires that all funds which are in fact appropriated be counted as "available for appropriation."

The key question in applying our interpretation of the term "amount available for appropriation" to particular funds [24] is what constitutes a valid appropriation such that the funds involved are no longer available. "Appropriation" is defined as

> something that has been appropriated; *specif.:* a sum of money set aside or allotted by official or formal action for a specific use (as from public revenue by a legislative body that stipulates the amount, manner, and purpose of items of expenditure).

*Webster's Third New Int'l Dictionary* 106 (1969). *Black's Law Dictionary* defines "appropriation" as

> [t]he act of appropriating or setting apart; prescribing the destination of a thing; designating the use or application of a fund
> 
> . . . .
> 
> In governmental accounting, an expenditure authorized for a specified amount, purpose, and time.
> 
> . . . .
> 
> *Public law.* The act by which the legislative department of government designates a particular fund, or sets apart a specified portion of the public revenue or of the money in the public treasury, to be applied to some general object of governmental expenditure, or to some individual purchase or expense. Authority given by legislature to proper officers to apply distinctly specified sum from designated fund out of treasury in given year for specified object or demand against the state.

*Black's Law Dictionary* 101–02 (6th ed. 1990); *see generally McAlpine v. University of Alaska,* 762 P.2d 81, 87–88 (Alaska 1988) (discussing definitions of "appropriation").

In *Thomas v. Rosen* we cited with approval the following definition of appropriation by the Wisconsin Supreme Court:

> An appropriation is the setting aside from the public revenue of a certain sum of money for a specified object, in such man-

24. In this regard, the State argues that the question of whether funds outside the unrestricted general fund are "available for appropriation" is "not justiciable in a court of law." To the extent the State argues that this court cannot decide the meaning of the term "available for appropriation" or the legal status of different funds under this definition, its position is without merit. The meaning of the constitution and its application to particular facts are questions squarely within the jurisdiction and inherent power of the judiciary. "[T]he judicial branch of government has the constitutionally mandated duty to ensure compliance with the provisions of the Alaska Constitution, including compliance by the legislature." *Malone v. Meekins,* 650 P.2d 351, 356 (Alaska 1982). The State's error is in assuming that the "power of appropriation necessarily includes the power to determine what amounts are available to finance appropriations enacted." *Compare Abood v. Gorsuch,* 703 P.2d 1158, 1161–62 (Alaska 1985) ("What quorum is necessary for the

confirmation votes is a question of Alaska constitutional law. It is therefore a question to which the nonjusticiability doctrine does not apply."). Although the court cannot say what particular funds should be used for appropriations, or set the amount of appropriations, it can and must determine the status of particular funds when such a determination is necessary for constitutional interpretation or enforcement.

The State is correct, however, insofar as it asserts that decisions to appropriate certain funds and withdraw other appropriations are political questions. All this means, however, is that the court cannot second guess the wisdom of individual appropriation or non-appropriation decisions. This limitation supports a definition of "available for appropriation" which does not require amounts validly appropriated to specific purposes to be counted. As these amounts have already been appropriated, counting them as available is functionally equivalent to questioning the wisdom of the original appropriation.

ner that the executive officers of the government are authorized to use that money, and no more, for that object, and no other. 569 P.2d 793, 796 (Alaska 1977) (quoting *State ex rel. Finnegan v. Dammann,* 220 Wis. 143, 264 N.W. 622, 624 (1936)). Finally, in *City of Fairbanks v. Fairbanks Convention and Visitors Bureau,* in determining that a local initiative did not make an appropriation, we asked "whether the initiative would set aside a certain specified amount of money or property for a specific purpose or object in such a manner that is executable, mandatory, and reasonably definite with no further legislative action." 818 P.2d 1153, 1157 (Alaska 1991).

Under these definitions, it is clear that one of the fundamental characteristics of an appropriation, in the public law context, is that it authorizes governmental expenditure without further legislative action. Therefore, funds established by the legislature which may be used to pay state expenditures without further legislative action are not available for appropriation, to the extent that expenditures are authorized. This is true regardless of whether the fund is nominally established within the general fund or within a state agency. For example, the oil and hazardous substance release response fund is a restricted fund within the general fund. AS 46.08.-010. The commissioner of environmental conservation is authorized to

> use money from the fund to
>
> (1) investigate and evaluate the release or threatened release of oil or a hazardous substance, and contain, clean up, and take other necessary action, such as monitoring and assessing, to address a release or threatened release of oil or a hazardous substance that poses an imminent and substantial threat to the public health or welfare, or to the environment.

AS 46.08.040(a). The entire balance of the fund could potentially be used by the com-

missioner of environmental conservation under this provision without any further authorization by the legislature.[25] In addition, AS 46.08.040(b) authorizes the governor to use money from the fund to respond to an oil or hazardous substance discharge emergency during the effective period of such an emergency declared under AS 26.23.020(c). Because the legislature has made the entire balance of this fund available for expenditure, the amounts deposited into the fund are validly appropriated and therefore no longer available for appropriation.

On the other hand, funds which require further legislative appropriation before expenditures can be made against them are available for appropriation. Thus, the Railbelt energy fund, AS 37.05.520, the Alaska marine highway system vessel replacement fund, AS 37.05.550, and the educational facilities maintenance and construction fund, AS 37.05.560, remain "available for appropriation," within the meaning of section 17(b). Each of these funds has the same general structure. Each is established as a "restricted" fund within the general fund, and each consists of money "appropriated" to it by the legislature. AS 37.05.520, .550(a), .560(a). These initial appropriations, however, are not sufficient to support any expenditure. Further legislative appropriations are necessary. *See* AS 37.05.520 ("The legislature may appropriate money from the fund for programs, projects, and other expenditures to assist in meeting Railbelt energy needs, including projects for retrofitting state-owned buildings for and facilities for energy conservation."); AS 37.05.550(a) ("The legislature may appropriate money from the fund for refurbishment of existing state ferry vessels, or replacement of retired or outmoded state ferry vessels."); AS 37.05.560(b) ("Money in the fund may be appropriated (1) to finance the design, construction, and maintenance of public school facilities; and (2) for mainte-

---

**25.** AS 46.08.040 lists eight other purposes for which the commissioner of environmental conservation may use money from the fund. *See* AS 46.08.040(a)(2)–(7) and (d)(1)–(2). Except as provided for in AS 46.08.040(d)(1), however, expenditures for these purposes are limited to amounts available from appropriations made specifically for the purposes listed. AS 46.08.-

040(c). AS 46.08.040(d)(1) provides that the commissioner of environmental conservation shall, upon request of the Alaska Legislative Council, "use money from the fund to reimburse the Alaska Legislative Council for expenditures that it makes for the operation of the Citizens' Oversight Council on Oil and Other Hazardous Substances."

nance of University of Alaska facilities.").[26] Because the initial "appropriations" to these funds cannot support any expenditure, the money in these funds remains "available for appropriation" until further appropriations are made.[27]

A similar analysis applies to the permanent fund earnings reserve account (earnings reserve account), AS 37.13.145. This fund is established as a separate account within the permanent fund under the authority of the last sentence of Article IX, § 15 of the Alaska Constitution: "All income from the permanent fund shall be deposited in the general fund unless otherwise provided by law." AS 37.13.145(a) provides otherwise: "The earnings reserve account is established as a separate account in the fund. Income from the fund shall be deposited by the corporation into the account as soon as it is received." Therefore, money in the earnings reserve account never passes through the general fund, and is never appropriated as such by the legislature.

A percentage of the money in the reserve account is automatically transferred to the

dividend fund at the end of each fiscal year. AS 37.13.145(b). After that transfer has been made, an additional amount is transferred from the earnings reserve account to the principal of the permanent fund in order to "offset the effect of inflation on principal of the fund." AS 37.13.145(c). No regular provision is made for amounts in the earnings reserve account in excess of that necessary to fund dividends and inflation proof the permanent fund principal. Absent an appropriation, this excess accumulates from year to year. The unencumbered balance of this account was $1.087 billion as of February 28, 1994.

The balance remaining in the earnings reserve account each year after the dividend and inflation-proofing transfers have been made is liquid, has never been appropriated by the legislature, and is not subject to expenditure without further legislative action. There are no statutory or constitutional prohibitions against direct appropriations from this account.[28] The earnings reserve account is therefore available for appropriation.[29]

**26.** The lists of specific purposes in each statute for which these second appropriations "may" be made are not sufficient to make the assignment of money to these funds "appropriations." Further appropriations are necessary before expenditures can be made. In addition, we have previously recognized that statutory statements that the legislature "may" appropriate money from funds within the general fund for specific purposes "impose no legal restraint on the appropriations power of the legislature." *Sonneman v. Hickel*, 836 P.2d 936, 939–40 (Alaska 1992).

**27.** In a hybrid situation, where expenditures can be made from part but not all of a fund, the fund is not available for appropriations to the extent that it is subject to expenditure without further legislative approval. We express no opinion on the possible status of funds which technically are subject to full expenditure, but which are funded well beyond any reasonably expectable need, as there is no evidence in the record before us that any such fund exists.

We also make no attempt to name and classify as "available" or "unavailable" every fund within the treasury of the State of Alaska. We leave it, in the first instance, to executive and legislative branch officials more familiar with all of the funds involved to apply the general definition we adopt today.

**28.** In a May 1990 memorandum describing the budget reserve amendment, budget officer Mary

Halloran states that the amount available for appropriation includes "all revenue sources, such as permanent fund earnings, federal funds and other restricted funds."

In addition, the language of section 17, and specifically the difference in language between sections 17(b) and (d), suggests that at least some funds outside the general fund may be available for appropriation. *Compare* § 17(b) ("the amount available for appropriation for a fiscal year") with § 17(d) ("the amount of money in the general fund available for appropriation").

**29.** In oral argument before the superior court, the State argued that the earnings reserve account should not be considered available because, under current projections of the Alaska Permanent Fund Corporation, the entire balance will be used for dividend payments and inflation proofing by the year 2010. This argument rests on reasoning similar to that which prompted us to conclude that the oil and hazardous substance release response fund was not available for appropriation: the entire account may be expended without further legislative action. Unlike the release response fund, which may be needed for expenditure at any time, the earnings reserve account balance will not·be used for many years to come. In the meantime, there are no restrictions on its use. Something more than a possibility of future use is necessary before a fund is considered no longer available for appropriation.

■ Alaska Statute 37.10.420 fails to include several funds—including trust receipts, "restricted" accounts within the general fund which require further legislative appropriation before they can be expended, and the permanent fund earnings reserve account—in the "amount available for appropriation" which are in fact available within the meaning of article IX, section 17 of the Alaska Constitution. It therefore does not provide an accurate definition of the constitutional term. Therefore, although we differ from the superior court in our analysis of the "amount available for appropriation," we affirm the superior court's decision declaring AS 37.10.420(a)(1) unconstitutional.

In summary, the "amount available for appropriation" within the meaning of article IX, section 17 of the Alaska Constitution includes all monies over which the legislature has retained the power to appropriate and which require further appropriation before expenditure. In addition, all amounts actually appropriated, whether or not they would have been considered available prior to appropriation, are available within the meaning of section 17. Illiquid assets, such as land and unexploited natural resources, are not available so long as they remain illiquid. For these reasons, trust receipts are available for appropriation, as are funds like the Railbelt energy fund and the educational facilities maintenance and construction fund, which are not available for expenditure without additional appropriations. In contrast, the oil and hazardous substance release response fund is not counted as available because the entire balance of the fund may be expended at any time without further legislative action. The availability of funds not specifically discussed in this opinion must be determined in accordance with this opinion. Finally, the permanent fund earnings reserve account must be counted as available for appropriation, because appropriations may be made from it and it is not subject to expenditure without legislative action.

**30.** This amount would include appropriations made from the constitutional budget reserve fund. It would not include "appropriations" made to funds from which additional appropriations are necessary before expenditures can be made. If the legislature both appropriates mon-

### B. "Amount appropriated for the previous fiscal year"

■ The meaning of the term "amount appropriated for the previous fiscal year" in article IX, section 17(b) of the Alaska Constitution follows logically from the definitions of the word "appropriation" listed above. The "amount appropriated for the previous fiscal year" means all amounts set aside for the previous fiscal year by the legislature "for a specific purpose or object in such a manner that is executable, mandatory, and reasonably definite with no further legislative action." *Fairbanks Convention and Visitors Bureau,* 818 P.2d at 1157. In short, the "amount appropriated" includes every dollar appropriated by the legislature, whatever its source.[30] Because our definition of the amount available for appropriation includes all amounts actually appropriated, it is unnecessary to exclude artificially any amount actually appropriated from the "amount appropriated" in order to achieve symmetry in the comparison. The State correctly argues that this symmetry is necessary in order to insure that the comparison required by section 17(b) fairly measures the need for access to the budget reserve fund. Contrary to the State's argument, however, symmetry can be obtained without abandoning the plain meaning of the words used in the constitution. Because AS 37.10.420(a)(2) does not include all actual appropriations made for the previous fiscal year in the "amount appropriated for the previous fiscal year," it does not accurately reflect the meaning of the constitutional term. We therefore affirm the superior court's decision declaring AS 37.10.-420(a)(2) unconstitutional.

### C. "Amount of appropriations made in the previous calendar year for the previous fiscal year"

■ Alaska Statute 37.10.420(a)(3) defines the "amount of appropriations made in the previous calendar year for the previous fiscal

ey into a fund which is not available for appropriation and removes money from the same fund to appropriate to a different purpose in the same year, the amounts should be offset so that the same amount of money is not counted twice in determining the total amount appropriated.

year" in terms of the unconstitutionally limited number of appropriation sources identified in subsection (a)(2) of the statute, which itself relies primarily on the sources identified in subsection (a)(1). It cannot be severed from these subsections and therefore is also unconstitutional, as the superior court properly held.

This term is meant to prevent the legislature from increasing prior year appropriations in order to increase access to the budget reserve in the present year.[31] Other than its unduly narrow interpretation of what counts as an appropriation, the definition of the term in AS 37.10.420(a)(3) appears to be consistent with this purpose. The "amount of appropriations made in the previous calendar year for the previous fiscal year" means the amount of all appropriations made in the calendar year in which the previous fiscal year began.

### D. Constitutionality of AS 37.10.420(b)

■ Alaska Statute 37.10.420(b) designates the means by which appropriations from the budget reserve fund are paid back to the fund. Article IX, § 17(d) provides:

If an appropriation is made from the budget reserve fund, until the amount appropriated is repaid, the amount of money in the general fund available for appropriation at the end of each succeeding fiscal year shall be deposited in the budget reserve fund. The legislature shall implement this subsection by law.

Pursuant to the authority granted it by § 17(d), the legislature enacted AS 37.10.-420(b), which provides:

If the amount appropriated from the budget reserve fund has not been repaid under art. IX, sec. 17(d), Constitution of the State of Alaska, the Department of Administration shall transfer to the budget reserve fund the amount of money comprising the unreserved, undesignated general fund balance to be carried forward as of June 30 of the fiscal year, or as much as necessary to complete the repayment. The transfer shall be made on or before December 16 of the following fiscal year.

This definition excludes restricted funds within the general fund from the calculation of the amount available to pay back appropriations from the budget reserve fund. As discussed above, some of these funds remain "available for appropriation" within the meaning of section 17.[32] Although the constitution gives the legislature authority to implement subsection (d), the legislature's authority must be exercised within the constraints of subsection (d)'s own requirements. Because AS 37.10.420 fails to consider all amounts which are "available for appropriation" within the meaning of section 17 in determining the State's repayment obligation, it is unconstitutional. The superior court's decision declaring AS 37.10.420(b) unconstitutional is therefore affirmed.

### III. *CONCLUSION*

The decision of the superior court is AFFIRMED, for the reasons stated in this opinion.

---

**31.** *See* Halloran memorandum, at 5 ("The phrase 'in the previous calendar year' was inserted by the House Finance Committee specifically to preclude stratagems whereby a supplemental appropriation to the current fiscal year ... could be made in order to increase the allowable size of a Budget Reserve Fund appropriation for the fiscal year being budgeted.")

**32.** We see no reason to give "available for appropriation" a different meaning in subsection (d) than we did in subsection (b). We recognize, however, that the payback provision in section 17(d) is limited to only those funds which are "available for appropriation" *and* "in the general fund." Thus, available amounts outside the general fund, such as the earnings reserve account, need not be deposited in the budget reserve. This additional limitation has no effect on funds which exist within the general fund.