Helen SIMPSON, Roger Anderson, Rose Anderson, Ruth Bohms, and Holger ("Jorgy") Jorgensen, for themselves and for others similarly situated, Appellants/Cross–Appellees,

v.

Frank H. MURKOWSKI, Governor, State of Alaska, Mike Miller, Commissioner, Department of Administration, State of Alaska, and State of Alaska, Appellees/Cross–Appellants.

Nos. S–11697, S–11777 [1].

Supreme Court of Alaska.

Feb. 10, 2006.

1. Although these cases were filed as separate appeals, we consolidated them for oral argument and are now consolidating them for purposes of decision.

Joe P. Josephson, Josephson & Associates, P.C., Anchorage, for Appellants and Cross–Appellees.

Joanne M. Grace, Assistant Attorney General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Appellees and Cross–Appellants.

Before: BRYNER, Chief Justice, MATTHEWS, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

Alaska's longevity bonus program was enacted by the Alaska Legislature in 1972 for the purpose of providing to Alaskans age sixty-five years and older an incentive to continue to live in Alaska. In 1993 Governor Hickel proposed a phase-out of the longevity bonus program that was designed to accommodate seniors who had "counted on the bonus in planning for their retirement." This proposal was subsequently enacted into law by the legislature. In 2003 Governor Murkowski exercised his line item veto power to eliminate the appropriation for the longevity bonus for fiscal year 2004.

A group of senior Alaskans who were recipients of the longevity bonus prior to Governor Murkowski's veto challenged the veto, arguing that they were entitled to receive the bonuses under the doctrine of promissory estoppel; that the program created a contract between them and the State with which Governor Murkowski unconstitutionally interfered; and that the statute created a legal

entitlement to the longevity bonus. The superior court granted summary judgment to the State on all of these claims. This appeal followed. Because the senior Alaskans' claims fail as a matter of law, we affirm.

The State also appeals, challenging the superior court's determination that the senior Alaskans are public interest litigants exempt from paying attorney's fees. Because the superior court did not make findings on the question whether the senior Alaskans had sufficient economic incentive to bring this litigation, we remand for further findings.

## II. FACTS AND PROCEEDINGS

### A. Facts

The Alaska Legislature enacted Alaska's longevity bonus program in 1972.[2] The purpose of the program was to provide to Alaskans age sixty-five and older who had maintained domicile in Alaska for at least twenty-five years an incentive to continue uninterrupted residence in the state.[3] Under the program, qualified Alaskans who did not leave the state for more than sixty consecutive days received a monthly bonus.[4] In 1984 the statute was amended in accordance with a decision of this court that the twenty-five-year residency requirement violated the Equal Protection Clause of the United States Constitution.[5] At that time, the legislature also amended the statute to provide that the longevity bonus program would be funded by "money made available by appropriations of the ... legislature from the general fund." [6]

In 1993 Governor Hickel proposed a phased reduction and eventual elimination of the longevity bonus program. Governor Hickel's proposal called for continuing payments at the rate of $250 per month to people already enrolled in the program and to people who would turn sixty-five before 1994, $200 per month to people turning sixty-five in 1994, $150 per month to people turning sixty-five in 1995, and $100 per month to people turning sixty-five in 1996.[7] Under Governor Hickel's proposal, the longevity bonus would be eliminated altogether for people turning sixty-five in 1997 and later.[8] Governor Hickel's transmittal letter to the Speaker of the House of Representatives explained that the suggested phase-out was due to budgetary constraints and that his proposal sought to accommodate seniors who had considered the bonus as a factor in planning their retirements:

> the power of the ballot. The legislature also is aware of the fact that many of these pioneers have been forced to live out their retirement years in areas far away from the land they loved and nurtured and thereby also suffering, in many cases, the loss of familial relationship with their own kin, an experience that is sad and frustrating to them as well as depriving new generations of Alaskans of the benefits of their wisdom and experience. This legislation hopefully will provide our pioneers with the economic means to remain in and continue to serve their state and to enjoy the opportunity of aiding the new Alaskan in making this state truly "The Great Land."

Quoted in Schafer v. Vest, 680 P.2d 1169, 1170 (Alaska 1984).

**2.** Ch. 205, SLA 1972.

**3.** AS 47.45.170 (1973). The original statement of purpose for former AS 47.45.170 read:

> The sole purpose of this chapter is to offer and provide all law-abiding Alaskans capable of managing their own affairs who have maintained a domicile in the state for at least 25 years and have reached a retirement age of 65, an incentive to continue uninterrupted residency in the state. Under no circumstances shall this chapter be considered a form, type, or manner, of public relief. Bonuses made under this chapter are not predicated on need even though they may appear to provide supplemental income to some qualified persons who would otherwise be forced to become responsibilities of the state. The legislature further finds and states that this legislation recognizes the economic hardships suffered by many elderly Alaskans, Alaskans who through their tenacity and perseverance molded Alaska as we know it through skillful application of their talents. These pioneers are the same Alaskans, who in the prime of their life were in effect treated as second-class citizens by the federal government and who paid much of their hard-earned income to a government in which they did not have the right to participate through

**4.** AS 47.45.030.

**5.** Schafer, 680 P.2d at 1171; ch. 38, SLA 1984.

**6.** Ch. 38, SLA 1984.

**7.** 1993 House Journal 131.

**8.** Id.

This bill is necessary because the ever-increasing number of senior citizens in Alaska, coupled with the projected decline in state revenue, makes it clear that the state will not be able to afford the longevity bonus program over the long term. It is becoming increasingly necessary to shift state resources from non-need-based programs to programs for those truly in need.... I am proposing this phased elimination because many Alaskans who will be reaching age 65 in the next four years have counted on the bonus in planning for their retirement, and an abrupt termination of the program would not be fair to them.[9]

The 1993 legislature adopted House Bill 81, which implemented Governor Hickel's phaseout proposal.[10]

The longevity bonus program continued to be funded through appropriations until fiscal year 2004. In 2003 Governor Murkowski submitted a proposed operating budget to the legislature for fiscal year 2004 that did not include any appropriation for the longevity bonus. The 2003 legislature amended the governor's proposed budget to include an appropriation for the longevity bonus program in the fiscal year 2004 operating budget. Governor Murkowski then exercised his line item veto power to eliminate the appropriation.

### B. Proceedings

On December 17, 2003, Helen Simpson and seven other plaintiffs ("Simpson" or "senior Alaskans") filed suit in the superior court challenging Governor Murkowski's decision to eliminate the longevity bonus program by using the line item veto.[11] The senior Alaskans are senior citizens who received longevity bonus payments until June 2003, when Governor Murkowski cancelled the program. Simpson's complaint alleged that (1) the provisions of AS 47.45.010 et seq., which set forth the longevity bonus program, create a legal entitlement to the longevity bonus for those senior Alaskans whose payments were interrupted as a result of the line item veto; (2) the senior Alaskans were entitled to receive longevity bonuses under the doctrine of promissory estoppel because they relied to their legal detriment upon express and implied promises that the bonuses would continue for the duration of their lives; (3) the provisions of AS 47.45.010 et seq. constitute a continuing appropriation for state constitutional purposes; and (4) the longevity bonus program established a contractual relationship between qualified Alaskan senior citizens and the state government, and the cessation of the bonuses violates Article I, Section 10, the Contract Clause, of the United States Constitution.

The State moved for summary judgment. On September 28, 2004, the superior court granted summary judgment to the State, concluding that Simpson's promissory estoppel, Contract Clause, and entitlement claims were without legal merit. In the alternative, the superior court concluded that Simpson could not prevail because the State was prohibited under section 13 of article IX of the Alaska Constitution from providing them with monetary relief.[12] Simpson filed this appeal.

On October 6, 2004, the State moved for attorney's fees under Civil Rule 82. Simpson opposed the motion, arguing that the senior Alaskans should be afforded public interest litigant status and should therefore be exempt from attorney's fees. The superior court concluded that the senior Alaskans were public interest litigants and that they were exempt from paying attorney's fees. The State appeals that determination.

---

9. *Id.*

10. Ch. 64, SLA 1993.

11. Helen Simpson, named plaintiff in this lawsuit, passed away during the course of this litigation, but remains the named plaintiff. Three of the original plaintiffs are not parties to this appeal.

12. Alaska Const. art. IX, § 13 states in part: "No money shall be withdrawn from the treasury except in accordance with appropriations made by law. No obligation for the payment of money shall be incurred except as authorized by law."

## III. DISCUSSION

### A. Standard of Review

■■■ We review a grant of summary judgment de novo and will affirm a grant of summary judgment "if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law."[13] We exercise our independent judgment when deciding questions of law and adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[14] We decide constitutional issues of law by applying our independent judgment.[15] In so doing we will adopt "a reasonable and practical interpretation in accordance with common sense based upon 'the plain meaning and purpose of the provision and the intent of the framers.'"[16] We review a trial court's award of attorney's fees for abuse of discretion.[17]

### B. The Superior Court Did Not Err in Holding that Simpson's Promissory Estoppel Claim Fails as a Matter of Law.

■■■ Simpson claims that the senior Alaskans are entitled to the longevity bonus under the doctrine of promissory estoppel. She claims that Governor Hickel's letter, which was well publicized and became a part of the legislative history of House Bill 81, constituted an enforceable promise. In order to prevail on a claim for promissory estoppel, the senior Alaskans must establish:

1) The action induced amounts to a substantial change of position;

2) it was either actually foreseen or reasonably foreseeable by the promisor;

3) an actual promise was made and itself induced the action or forbearance in reliance thereon; and

4) enforcement is necessary in the interest of justice.[18]

The superior court held that Simpson failed to satisfy the second and third prongs of the promissory estoppel test, determining that no action by the senior Alaskans could reasonably have been induced by Governor Hickel's letter, which was not even addressed to them, and that House Bill 81 could not be construed as a promise. We disagree that as a matter of law it was not reasonably foreseeable that the senior Alaskans would rely and act upon Governor Hickel's transmittal letter and the resulting House Bill 81. But we affirm the superior court's grant of summary judgment on the ground that Simpson has failed to establish an enforceable promise.

■■■ With respect to the first prong of the promissory estoppel test, "[w]hether particular actions represent substantial changes is a question of all the circumstances and is not determinable by reference to a set formula."[19] Simpson, through uncontroverted evidence in the form of affidavits accompanying her opposition to the State's motion for summary judgment, established that the senior Alaskans changed their positions in reliance upon the longevity bonus. For example, Simpson presented evidence that the senior Alaskans curtailed their travel plans to meet

13. *Schaub v. K & L Distribs., Inc.,* 115 P.3d 555, 559 (Alaska 2005).

14. *See, e.g., Rockstad v. Erikson,* 113 P.3d 1215, 1219 (Alaska 2005).

15. *See, e.g., Alaska Legislative Council v. Knowles,* 21 P.3d 367, 370 (Alaska 2001).

16. *Id.*

17. *See, e.g., City of Kodiak v. Samaniego,* 83 P.3d 1077, 1082 (Alaska 2004).

18. *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1284 (Alaska 1985). Simpson proposes the application of the four-part test for *equitable* estoppel articulated by this court in *Wassink v.*

*Hawkins,* 763 P.2d 971, 975 (Alaska 1988). As this court explained in *Mortvedt v. State, Department of Natural Resources,* the "primary difference between promissory and equitable estoppels is that the former is offensive, and can be used for affirmative enforcement of a promise, whereas the latter is defensive, and can be used only for preventing the opposing party from raising a particular claim or defense." 858 P.2d 1140, 1143 n. 7 (Alaska 1993) (quoting *James v. State,* 815 P.2d 352, 355 n. 9 (Alaska 1991)) (internal citations omitted). Because Simpson seeks to enforce an alleged promise, the four-part test for *promissory* estoppel set forth by this court in *Zeman* is the appropriate test.

19. *Zeman,* 699 P.2d at 1284, (citing 1A A. Corbin, Corbin on Contracts § 200, at 216 (1963)).

the eligibility requirements for receiving longevity bonuses. Harold Starkel stated (concerning his own and his late wife's actions):

We had arranged our lives so that we were both here in Alaska as required when the checks arrived each month and many times we curtailed travel plans so that all requirements on our part were met.

Ruth Bohms stated that she and her late husband

took great care to comply with all the terms and conditions of the program. For example, in addition to remaining in Alaska as residents, we took no trips away from Alaska which had a duration or expected duration beyond the number of days permitted for recipients to be physically elsewhere.

Simpson also offered evidence that the senior Alaskans made critical decisions about retirement and long-term financial planning based upon the availability of the longevity bonus.

The late Helen Simpson noted:

My qualification for the Longevity Bonus has influenced other decisions as well, including ... my decision to retire from [law] practice about two years ago, before Governor Murkowski's election.

Significantly, Simpson demonstrated that the senior Alaskans "continue[d] uninterrupted residency" [20] in Alaska in reliance on the bonus. Some senior Alaskans noted that had they not anticipated receiving the bonus, they would have relocated by moving closer to children living outside of Alaska or settling in retirement communities in warmer climates. For instance, in her affidavit Ruth Bohms stated:

Years ago, while my late husband was still alive, we spoke about and planned for our lives as elder Alaskans in "the golden years." We actively considered leaving Alaska. A child of ours lives near Anchorage, but another child lives, with her husband and children, in Washington State....

Jerry and I, in the course of our planning, made a very careful analysis of the state of our finances. The availability of the longevity bonus was a critical factor in our decision to remain in Alaska.

And Helen Simpson commented:

I gave serious consideration to moving to Guadalajara, Mexico, where there was a substantial group or colony of American retirees. I even made a personal visit to Guadalajara to inspect possible places to buy. However, it was at about this time that the Longevity Bonus, inaugurated by legislation adopted in 1972, became effective. I made a personal decision to remain in Alaska rather than give up the bonus.

By presenting this undisputed evidence, Simpson established a substantial change of position sufficient to defeat summary judgment on the first prong of the promissory estoppel test. According to Corbin on Contracts, "[f]oreseeability of reliance raises a question of fact for court and jury." [21] The superior court determined that any action that might have been induced by Governor Hickel's letter was not foreseeable. We disagree and hold that Simpson did raise a question of fact whether it was foreseeable that senior Alaskans would rely upon Governor Hickel's letter and the legislation which subsequently implemented his proposal. The stated purpose of the longevity bonus was to provide to senior Alaskans through monthly payments "an incentive to continue uninterrupted residence in the state." [22] Far from it being unforeseeable that the senior Alaskans would rely upon the longevity bonus program in making decisions about planning their retirement and in remaining in Alaska, the actions on the part of the senior Alaskans induced by the longevity bonus program were expressly intended by the legislature.

Governor Hickel's proposal to phase out the longevity bonus program sought to protect senior citizens who had relied upon the longevity bonus program. The transmittal read:

20. AS 47.45.170 (1973).

21. 1A A. CORBIN, CORBIN ON CONTRACTS § 200, at 216 (1963).

22. AS 47.45.170 (1973).

*The bill protects current bonus recipients,* and those future recipients who turn 65 before January 1, 1994, by providing that they will receive $250 a month for the remainder of their lives (as long as the eligibility requirements are met). The bill phases out the program by reducing to $200 the monthly bonus for those turning 65 in 1994, by reducing to $150 the monthly bonus for those turning 65 in 1995, by reducing to $100 the monthly bonus for those turning 65 in 1996, and by eliminating the bonus altogether for those turning 65 in 1997 and later.

I am proposing this phased elimination because many Alaskans who will be reaching age 65 in the next four years *have counted on the bonus in planning for their retirement, and an abrupt termination of the program would not be fair to them.*[23]

(Emphasis added.)

The proposal set forth in the transmittal letter and the legislation implementing the proposal evinced a desire on the part of the governor and the legislature to protect senior citizens who had relied on the longevity bonus program by extending the benefits of the program. It cannot be said as a matter of law that it was unreasonable for the senior Alaskans to rely upon Governor Hickel's letter and House Bill 81, the language of which suggested that they would continue to enjoy the benefits of the program for the remainder of their lives. And it cannot be said that it was unforeseeable that the senior Alaskans would take the very actions that were expressly invited by the purpose clause of the statute that originally enacted the longevity bonus program.[24] We therefore disagree with the superior court's determination that

"[n]o action by the [senior Alaskans] could have reasonably been induced by this letter."

We turn next to the question whether Governor Hickel's letter and House Bill 81 can reasonably be construed as a promise.

■ To make out a claim for promissory estoppel, one must show that "an actual promise was made."[25] Governor Hickel's letter stated:

I am *proposing* this phased elimination because many Alaskans who will be reaching age 65 in the next four years have counted on the bonus in planning for their retirement, and an abrupt termination of the program would not be fair to them. I urge your prompt consideration and passage of this bill.[26]

(Emphasis added.) The superior court interpreted this language to mean that the letter was "simply a proposal to phase out the longevity bonus program; it did not establish law or make any specific promise to any specific individuals."

Simpson argues that the superior court's analysis was flawed and that the letter's publication in the House Journal made it more than simply a proposal:

The letter was put in the Journal for a reason: to explain to legislators, to [the] press, and to [the] public what the legislation was meant to accomplish. One of its avowed purposes was to safeguard and hold inviolate the longevity bonus payments for qualified Alaskans choosing to participate in the program and continue to qualify.

Simpson further argues that the purpose language of the statute "underscored the letter's pledge to eligible seniors that the bonuses would continue."[27] Under this court's

23. 1993 House Journal 131.

24. *See supra* note 3 (the text of the original purpose).

25. *Brady v. State,* 965 P.2d 1, 10 & n. 20 (Alaska 1998); *James,* 815 P.2d at 357 (quoting *Zeman,* 699 P.2d at 1284).

26. 1993 House Journal 131.

27. Simpson additionally raises the argument that the State should be judicially estopped from taking the position that there was no promise because the State took a contrary position in a previous case before the superior court, *Maggard v. Sipe,* case No. 3AN–94–03935 CI. In *Maggard,* the plaintiffs challenged the sunset clause contained in House Bill 81, which became AS 47.45.010(a). The State argued in *Maggard* that the sunset clause represented a legitimate effort to protect the "reliance interests" of those seniors already enrolled in the longevity bonus program. But the State also noted that "no recipient has a legally enforceable contractual right to receive the bonus in perpetuity" and declared

precedents, though, neither the language of the transmittal letter nor the legislation's statement of purpose are sufficiently definite to qualify as "an actual promise." [28] Governor Hickel's letter stated that he was *proposing* a phased elimination. This language supports the superior court's conclusion that the letter was a proposal and not a promise. That the letter was subsequently incorporated into the legislative history of House Bill 81 does not change the tentative nature of this language and Simpson cites no case to support her contention that the proposal evolved into a promise when it was enacted into law.

Our previous promissory estoppel decisions illustrate that an actual promise must be very clear. For instance, in a case involving an alleged promise to negotiate a contract for a lease on property owned by the Valdez Fisheries Association, we considered a letter sent to Valdez Fisheries by Alyeska Pipeline Service Company.[29] The letter informed Valdez Fisheries that it had been selected as the winning bidder for the lease and stated: "We intend to begin the process of negotiating a contract as soon as possible. For your planning purposes, we would like to begin discussions the week of May 16, 1994." [30] We concluded that the language did not constitute an actual promise to negotiate and that it was "a statement of present intent, not a promise." [31]

Our decision in *Eufemio v. Kodiak Island Hospital* further illustrates the precision of language required before a promise will be found.[32] There, we held that a hospital hearing committee's speculation that "a year's additional training in a structured setting, surrounded by examples of current good medical and surgical practice, would substantially improve [the plaintiff's] qualifications for medical staff membership" did not constitute a promise that the plaintiff would be granted medical staff membership after he received a year's additional training.[33] Both *Valdez Fisheries* and *Eufemio* demonstrate that a promise must be definitive in order to fulfill the "actual promise" prong of the promissory estoppel test. Governor Hickel's transmittal letter contained no such precise language and neither the fact that the proposal was subsequently enacted nor the purpose clause of the statute enacting the longevity bonus program cure this deficiency.

Furthermore, on the face of Governor Hickel's transmittal letter it is apparent that he did not have the authority to make a promise to the senior Alaskans that they would continue to receive the longevity bonus for the remainder of their lives. He expressly stated that he "urge[d] ... prompt consideration and passage of this bill." We held in *James v. State* under analogous circumstances that an author of a letter who "lacked authorization on his own to grant preference rights" could not promise to grant preference rights.[34] In *James*, the plaintiffs had participated in a land lottery conducted by the Department of Natural Resources (DNR).[35] We held the lottery invalid [36] and DNR decided it would cure the problems found with the first lottery and conduct another lottery.[37] The director of the Division of Land and Water Management wrote a letter to the lottery winners from the invalid lottery indi-

that "had the legislature decided to terminate the [longevity bonus program] immediately ... no bonus recipient could sue." Because the position taken by the State in *Maggard* was not in fact contradictory to the position it has taken in this litigation, we need not address the issue of whether judicial estoppel could apply to estop the State from arguing that there was no promise in this case.

28. *Brady*, 965 P.2d at 10 & n. 20; *James*, 815 P.2d at 357 (quoting *Zeman*, 699 P.2d at 1284).

29. *Valdez Fisheries Dev. Ass'n, Inc. v. Alyeska Pipeline Serv. Co.*, 45 P.3d 657, 668 (Alaska 2002).

30. *Id.* at 663.

31. *Id.* at 668.

32. 837 P.2d 95, 103 (Alaska 1992).

33. *Id.*

34. 815 P.2d at 358.

35. *Id.* at 355.

36. *State v. Weidner*, 684 P.2d 103, 110–11 (Alaska 1984).

37. *James*, 815 P.2d at 354.

cating that they would be afforded preference in the second lottery:

> It is my decision to allow each individual Potlatch Ponds parcel winner ... the right to apply for a preference right of purchase for the agricultural interests to the Potlatch Ponds parcel each originally claimed, or another parcel of similar size or value, pursuant to AS 38.05.035(b)(2).[38]

We noted that the letter allowed for the right to apply for a preference right "pursuant to AS 38.05.035(b)(2)," a statute requiring the commissioner to expressly approve each grant of a preference right. Because the letter "was clear with respect to the status of the preference rights at issue: they would have to be approved by the Commissioner" they "did not grant or promise to grant preference rights." [39] Similarly, in this case Governor Hickel's proposed phase-out of the longevity bonus program expressly noted that it was subject to the approval of the legislature. Under *James,* his letter therefore did not constitute a promise.

Because we affirm the superior court's decision that Simpson failed to establish that a promise was made, we need not reach the question whether enforcement of the purported promise would be necessary in the interests of justice.

### C. The State's Discontinuation of the Longevity Bonus Did Not Violate the Contract Clause of the United States Constitution.

 Simpson claims that cancellation of the longevity bonus was an impairment of an existing contract in violation of Article I, Section 10 of the United States Constitution, which provides: "No State shall ... pass any ... Law impairing the Obligation of Con-

tracts." Rejecting this argument, the superior court concluded that the longevity bonus program was not an open offer to contract and therefore did not implicate the Contract Clause. We agree.

 Courts apply a two-part test when determining whether a state law violates the Contract Clause. First, courts examine "whether the change in state law has 'operated as a substantial impairment of a contractual relationship.' " [40] If the first prong is answered affirmatively, the court then examines whether the impairment is "reasonable and necessary to serve an important public purpose." [41] Whether a state law operates as a substantial impairment of a contractual relationship is assessed in three parts: (1) whether there is a contractual relationship; (2) whether a change in law impairs the contractual relationship; and (3) whether the impairment is substantial.[42] Because we concur with the superior court's decision that Simpson did not meet the threshold requirement that a contract exist between the senior Alaskans and the State, we affirm the superior court's decision that Simpson failed to establish a violation of the Contract Clause as a matter of law.

 We have cited the Federal Court of Claims decision in *Clawson* with approval:

> It would do violence to traditional contract theory, not to mention the operation of government, to hold that any statute requiring some action by a citizen to obtain a benefit or protect a right constituted an open offer to contract.[43]

It is therefore presumed that "a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." [44] The United States Supreme

---

**38.** *Id.*

**39.** *Id.* at 358.

**40.** *Gen. Motors Corp. v. Romein,* 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992) (quoting *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978)).

**41.** *U.S. Trust Co. of N.Y. v. N.J.,* 431 U.S. 1, 25, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); *see also Parker v. Wakelin,* 123 F.3d 1, 5 (1st Cir.1997).

**42.** *Romein,* 503 U.S. at 186, 112 S.Ct. 1105.

**43.** *Beluga Mining Co. v. State,* 973 P.2d 570, 578 (Alaska 1999) (citing *Clawson v. United States,* 24 Cl.Ct. 366, 370 (1991)).

**44.** *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 466, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) (quoting *Dodge v. Bd. of Educ.,* 302 U.S. 74, 79, 58 S.Ct. 98, 82 L.Ed. 57 (1937)).

Court has made clear that this presumption is inherent in the function of the legislative branch:[45] "Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body."[46] It is the burden of the party asserting the contract to overcome this well-founded presumption.[47]

In an attempt to meet this burden, Simpson argues that the longevity bonus program "establishes a true unilateral contract, providing an exchange of a promise for behavior." But as discussed above in the context of the promissory estoppel claim, the State did not in fact make a promise to the senior Alaskans that they would receive benefits under the longevity bonus program for the rest of their lives.[48] Governor Hickel's letter stated that he was *proposing* a phaseout of the longevity bonus program and made it clear that it was the legislature, rather than the executive branch, that had the authority to enact the proposed legislation. The language of Governor Hickel's letter is therefore insufficient to establish the promise Simpson argued was the State's consideration in this purported unilateral contract.

 Nor does the language of the statute implementing Governor Hickel's proposal suggest that the legislature intended to create a contract. The United States Supreme Court has stated that "[i]n general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State."[49] The Supreme Court has also emphasized that the most important step in any analysis of whether a state legislature intended to treat a statute as a contract is the language of the statute itself.[50] In general, courts will look for language specifically creating a contract or expressly prohibiting future amendments that would reduce benefits.[51] None of the provisions of AS 47.45 demonstrate an intent on the part of the Alaska Legislature to bind the State to a contract and Simpson does not meet her burden by pointing to any specific language in the statute or the legislative history indicating an intent to contract.[52] Because AS

---

45. Simpson argues that the superior court's reliance on *Beluga Mining* is misplaced because of the unique character of mining law. But as shown by applicable United States Supreme Court case law, the presumption that a law is not intended to create contractual rights is well established, regardless of the type of statute involved.

46. *Nat'l R.R. Passenger Corp.*, 470 U.S. at 466, 105 S.Ct. 1441.

47. *Id.*

48. *See, e.g., Valdez Fisheries*, 45 P.3d at 668 ("When a promissory estoppel claim is made in conjunction with a breach of contract claim, the 'actual promise' element of promissory estoppel is analytically identical to the acceptance [or offer] required for a contract.") (citing *Brady*, 965 P.2d at 11).

49. *U.S. Trust Co. of N.Y.*, 431 U.S. at 18 n. 14, 97 S.Ct. 1505.

50. *Nat'l R.R. Passenger Corp.*, 470 U.S. at 466–67, 105 S.Ct. 1441 (concluding that statute did not contain any language indicating intent to contract, and thus there was no contract).

51. *See U.S. Trust Co. of N.Y.*, 431 U.S. at 18, 97 S.Ct. 1505 (finding intent to contract due to statute's use of phrase "covenant and agree").

52. Simpson acknowledges that ordinarily public benefit programs created by statute do not create contracts and can be altered or eliminated at any time as long as the recipients are afforded due process. *See U.S. R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 174, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) ("railroad benefits, like social security benefits, are not contractual and may be altered or even eliminated at any time"); *Richardson v. Belcher*, 404 U.S. 78, 80, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971) ("an expectation of public benefits [does not] confer a contractual right to receive the expected amounts"); *Flemming v. Nestor*, 363 U.S. 603, 611, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) (calling social security a "noncontractual benefit"). Simpson argues that the longevity bonus program is different from typical public benefits programs because the statutes creating those programs specify that they may be amended or repealed. In making this argument, Simpson overlooks the strong presumption against treating a statute like a contract and the burden that is placed on the party asserting the contract to establish through the language of the statute an intent to contract. *Nat'l R.R. Passenger Corp.*, 470 U.S. at 466, 105 S.Ct. 1441. The mere absence of language that the program could be amended or repealed is not sufficient to overcome this presumption. *Id.* at 466–67, 105 S.Ct. 1441.

47.45 contains no language evincing a clear and unequivocal intent to create a binding contract, we affirm the superior court's conclusion that "the Contract Clause is simply not implicated."

### D. The Senior Alaskans Are Not Entitled to the Longevity Bonus Under AS 47.45.

■ Simpson argues that, despite Governor Murkowski's veto, the senior Alaskans are entitled to longevity bonus payments because the provisions of AS 47.45 remain unrepealed, mandating continuation of the program. In response to this argument, the superior court concluded that "House Bill 81 provided for payment of the longevity bonus out of annual appropriations; by failing to make such an appropriation in 2004, the legislature acted in a way that was contemplated by and consistent with AS 47.45." Because the Alaska Constitution supports the superior court's conclusion, we affirm.

Simpson concedes "that entitlement programs can be modified by subsequent enactments." [53] She also concedes that "the legislative process, when it repeals an entitlement program or reduces [an] entitlement benefit, may provide all of the 'due process' to which affected citizens are due." She essentially argues, then, that although the legislature could eliminate or reduce the longevity bonus program, as long as AS 47.45 remains law the governor is not empowered to use his veto power with respect to appropriations to fund the program. But the plain language of the Alaska Constitution invalidates this argument.

As the State argues, the Alaska Constitution contemplates a role for both the governor and the legislature in the appropriations process. The legislature has the power to pass appropriation bills.[54] With regard to the governor's role, section 12 of article IX of the Alaska Constitution states: "The governor shall submit to the legislature, at a time fixed by law, a budget for the next fiscal year setting forth all proposed expenditures and anticipated income of all departments, offices, and agencies of the State. The governor, at the same time, shall submit a general appropriation bill to authorize the proposed expenditures, and a bill or bills covering recommendations in the budget for new or additional revenues." Section 15 of article II of the Alaska Constitution establishes the power of the governor to exercise a line item veto with respect to appropriation bills, providing that "[t]he governor may veto bills passed by the legislature. He may, by veto, strike or reduce items in appropriation bills."

In *Alaska Legislative Council v. Knowles,* we examined the history and purpose of the line item veto, noting:

It gives the governor the power to influence the state's budget by requiring him or her to submit a proposed budget and general appropriation bill to the legislature and by striking or reducing items appropriated by the legislature.[55]

In *Thomas v. Rosen,* we recognized that "[t]he constitutional history underlying this provision indicates a desire by the delegates to create a strong executive branch with 'a strong control on the purse strings' of the state." [56]

The constitution also allows the legislature to override a governor's veto. Section 16 of article II of the Alaska Constitution provides in part: "Bills to raise revenue and appropriation bills or items, although vetoed, become law by affirmative vote of three-fourths of the membership of the legislature."

In 2003 Governor Murkowski submitted a proposed operating budget to the legislature for fiscal year 2004 that did not include an appropriation for the longevity bonus. The 2003 legislature amended the proposed budget to include an appropriation for the longevity bonus program for 2004. Governor Murkowski then exercised his line item veto

**53.** When conceding this point, Simpson cites *Gattis v. Gravett,* which states that "the legislature which creates a statutory entitlement (or other property interest) is not precluded by having done so from altering or terminating the entitlement by subsequent legislative enactment." 806 F.2d 778, 780 (8th Cir.1986).

**54.** Alaska Const. art. II, § 1; art. II, § 13.

**55.** 21 P.3d 367, 371 (Alaska 2001).

**56.** 569 P.2d 793, 795 (Alaska 1977).

power to eliminate the appropriation. The legislature did not use its constitutional power to override Governor Murkowski's veto and to reinstate the appropriation. This sequence of events occurred in accordance with the appropriations process set forth in the Alaska Constitution and Simpson provides no basis for us to conclude that, simply because AS 47.45 has not been repealed, a veto of the appropriation was improper.

Simpson also urges that we mandate funding of the longevity bonus entitlement because AS 47.45 has not been repealed. But the cases she cites in support of this request are inapposite. For example, in *Department of Health & Social Services v. Planned Parenthood of Alaska*, we struck down a state regulation denying funding for medically necessary abortions, but we emphasized that we were doing so in order to protect the *constitutional* rights of Alaskans.[57] At issue in this proceeding is funding with respect to a statutory entitlement program, not a constitutional right. *Planned Parenthood* therefore does not apply.

Simpson also cites *Bresolin v. Morris*,[58] in which the Washington Supreme Court ruled that the state legislature impermissibly refused to fund statutorily mandated drug treatment programs. But the Washington Supreme Court stopped short of requiring the legislature to appropriate funds. It expressed optimism that the legislature might do so, but posited transfer of the petitioning prisoner as an alternative.[59]

■ We recognized in *Knowles* the tension "between a desire to prevent legislatures from using appropriations bills to make programmatic changes . . . and the realization that legislatures do not have to fund or fully fund any program (except, possibly, constitutionally mandated programs)."[60] As the superior court concluded, under the Alaska Constitution "it is the joint responsibility of the governor and the legislature to determine the State's spending priorities on an annual basis." Therefore the same tension acknowledged in *Knowles* exists with respect to the governor's exercise of the line item veto. Because Simpson has not identified a legal basis for divergence from the procedure constitutionally prescribed for appropriations and because she has made no viable claim that a constitutional right was violated when the governor vetoed the appropriation, we affirm the superior court's grant of summary judgment to the State.[61]

### E. We Remand the Superior Court's Decision that the Senior Alaskans Were Public Interest Litigants.

■ Following the superior court's grant of summary judgment, the State moved for attorney's fees under Civil Rule 82. Simpson opposed the motion on the ground that the senior Alaskans were public interest litigants under this court's precedents and were therefore exempt from paying attorney's fees. In response, the State argued that the senior Alaskans were not public interest litigants because they had sufficient economic interest to bring this litigation. Further, the State argued, even if the senior Alaskans were public interest litigants, AS 09.60.010 abrogated the rule exempting public interest litigants from paying attorney's fees except in limited circumstances, inapplicable to this case. The superior court found that the senior Alaskans were exempt from paying attorney's fees but did not articulate a basis for its finding, stating only that "[p]laintiffs, as public[ ]interest litigants, are exempt from the payment of attorney's fees in this case."

---

57. 28 P.3d 904, 914 (Alaska 2001).

58. 86 Wash.2d 241, 543 P.2d 325 (1975). Simpson also cites *State v. Weiss*, 706 P.2d 681 (Alaska 1985). In *Weiss*, this court held that the legislature improperly cancelled a trust, but the case did not concern appropriations. *Id.* The final case cited by Simpson, *Cleary v. Smith*, case No. 3AN–81–05274 CI, is a superior court case that settled and was not litigated on the merits.

59. *Bresolin*, 543 P.2d at 331.

60. 21 P.3d at 378.

61. Because we affirm the superior court's grant of summary judgment to the State on the promissory estoppel, Contract Clause, and entitlement claims, we need not reach the superior court's alternative conclusion that article IX, section 13 of the Alaska Constitution would independently prohibit Simpson from obtaining relief on her claims.

In 2003 the legislature enacted a statute expressly abrogating the special status given to public interest litigants with respect to the award of attorney's fees and costs under this court's precedents and limiting the circumstances in which public interest litigants would be considered exempt from paying attorney's fees.[62] This statute became effective September 11, 2003 and applies to all civil actions filed after the effective date, including this case, which was commenced on December 18, 2003.[63]

Under AS 09.60.010(b), as amended, public interest litigants are generally not exempt from paying attorney's fees. The statute provides:

> (b) Except as otherwise provided by statute, a court in this state may not discriminate in the award of attorney fees and costs to or against a party in a civil action or appeal based on the nature of the policy or interest advocated by the party, the number of persons affected by the outcome of the case, whether a governmental entity could be expected to bring or participate in the case, the extent of the party's economic incentive to bring the case, or any combination of these factors.

But public interest litigants may be exempt from paying attorney's fees under certain circumstances. Relevant to this case, AS 09.60.010(c)(2) provides:

> (c) In a civil action or appeal concerning the establishment, protection, or enforcement of a right under the United States Constitution or the Constitution of the State of Alaska, the court:
>
> . . . .
>
> (2) may not order a claimant to pay the attorney fees of the opposing party devoted to claims concerning constitutional

rights if the claimant as plaintiff, counter-claimant, cross claimant, or third-party plaintiff in the action or appeal did not prevail in asserting the right, the action or appeal asserting the right was not frivolous, and the claimant did not have sufficient economic incentive to bring the action or appeal regardless of the constitutional claims involved.

Simpson argues and the State agrees that the phrase "regardless of the constitutional claims involved" means that the appropriate inquiry under the statute is whether the plaintiff would have had sufficient economic incentive to bring the action in the absence of any constitutional claims that might be made. This provision mirrors the fourth prong of the test for identifying public interest litigants used by this court prior to the enactment of AS 09.60.010(c)(2), which asked, "[w]ould the purported public interest litigant have sufficient economic incentive to file suit even if the action involved only narrow issues lacking general importance?" [64]

In its order denying attorney's fees to the State, the superior court did not address the question whether the senior Alaskans would have had sufficient economic interest to bring this lawsuit even if the case involved only narrow issues lacking general importance. Yet the economic incentive of the senior Alaskans to bring this lawsuit was one of the central issues raised by the State in its briefing before the superior court with respect to attorney's fees. More explicit findings with respect to the economic interest of the senior Alaskans in bringing this lawsuit are therefore necessary before we can meaningfully review the superior court's decision that the senior Alaskans were public interest litigants exempt from paying attorney's fees.[65] Be-

---

**62.** Ch. 86, SLA 2003. Simpson does not challenge the validity of AS 09.60.010, as amended, and our interpretation of the statute should not be viewed as a reflection of how we might rule if a challenge to the statute were properly before us.

**63.** *Id.*

**64.** *Citizens Coalition for Tort Reform, Inc. v. McAlpine,* 810 P.2d 162, 171 (Alaska 1991).

**65.** Under Alaska Civil Rule 52(a), a superior court's order must "contain specific findings of

fact and conclusions of law to permit meaningful review" by this court. Cf. *Fyffe v. Wright,* 93 P.3d 444, 456 (Alaska 2004); *Ilardi v. Parker,* 914 P.2d 888, 892 (Alaska 1996). A superior court's findings are sufficiently "clear and explicit" to satisfy Rule 52(a) if they resolve all critical areas of dispute in the case and are sufficiently detailed to allow for meaningful appellate review. *Mapco Express, Inc. v. Faulk,* 24 P.3d 531, 537 (Alaska 2001). In particular, the superior court must provide findings sufficient to give a clear understanding of the grounds upon which it reached its decision. *Ilardi,* 914 P.2d at 892.

449

cause this fact specific inquiry is more appropriately undertaken by the superior court in the first instance, we remand the superior court's award of attorney's fees for further findings on the question whether the senior Alaskans would have had sufficient interest to bring this litigation if the case involved only narrow issues lacking general importance.[66]

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's grant of summary judgment to the State on the promissory estoppel, Contract Clause, and entitlement claims. We REMAND the superior court's award of attorney's fees for a determination of whether the senior Alaskans would have had an economic incentive to bring this lawsuit if the action involved only narrow issues lacking general importance and for an evaluation of whether the senior Alaskans would be entitled to an abatement of attorney's fees under AS 09.60.010(e).

EASTAUGH, Justice, not participating.

66. During oral argument in this case, Simpson also argued that the senior Alaskans would qualify for an abatement of attorney's fees under AS 09.60.010(e), which provides:

The court, in its discretion, may abate, in full or in part, an award of attorney fees and costs ... if the court finds, based upon sworn affidavits or testimony, that the full imposition of the award would inflict a substantial and undue hardship upon the party ordered to pay the fees and costs or, if the party is a public entity, upon the taxpaying constituents of the public entity.

On remand, the parties are free to raise before the superior court the question whether an abatement would be appropriate in this case.