*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BILL WIELECHOWSKI, RICK HALFORD, and CLEM TILLION, | ) ) ) | Supreme Court No. S-16558 |
| Appellants, | ) ) ) | Superior Court No. 3AN-16-08940 CI |
| v. | ) ) ) | O P I N I O N |
| STATE OF ALASKA and ALASKA PERMANENT FUND CORPORATION, | ) ) ) | No. 7194 – August 25, 2017 |
| Appellees. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: Bill Wielechowski, pro se, Anchorage, and Sonja N. Kawasaki, Fairbanks, for Appellants. Kathryn R. Vogel, Margaret Paton-Walsh, and Bill Milks, Assistant Attorneys General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellees. Jack B. McGee, Law Office of Jack B. McGee, Juneau, for Amici Curiae Greg Capito, Jack Gitchell, and Vicki Van Fleet.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

WINFREE, Justice.

## I.      INTRODUCTION

This appeal provides another opportunity to remind Alaskans that, of the three branches of our state government, we are entrusted with the "constitutionally

mandated duty to ensure compliance with the provisions of the Alaska Constitution."[1] This sometimes requires us to answer constitutional questions surrounded by political disagreement.[2] Today we address a constitutional question arising from a political dispute about the legislatively enacted Alaska Permanent Fund dividend program.

In the course of the 2016 budgetary process, in accordance with a statutorily prescribed formula in place for over three decades, the legislature appropriated a sum of money for dividend distributions. But the governor then vetoed about half of the appropriation, and the legislature did not override the veto. One current and two former legislators later sued to effectively set aside the governor's veto. The thrust of their argument was that the 1976 constitutional amendment creating the Alaska Permanent Fund gave the legislature constitutional authority to pass laws dedicating use of Permanent Fund income without need for annual appropriations and, therefore, not subject to annual gubernatorial veto. The legislators argued that the longstanding dividend program was a law exempt from the anti-dedication clause.

The superior court ruled against the legislators, concluding that even if the 1976 constitutional amendment gave the legislature dedication powers over Permanent Fund income, the legislature's actual use of the income remained subject to normal appropriation and veto budgetary processes. The legislators appeal, making the same

---

[1]     *Malone v. Meekins*, 650 P.2d 351, 356 (Alaska 1982) (citing *State v. A.L.I.V.E. Voluntary*, 606 P.2d 769 (Alaska 1980); *Plumley v. Hale*, 594 P.2d 497 (Alaska 1979); *K & L Distribs., Inc. v. Murkowski*, 486 P.2d 351, 357 (Alaska 1971)).

[2]     *State v. Planned Parenthood of Alaska*, 171 P.3d 577, 579 (Alaska 2007). We reiterate that "[w]e are not legislators, policy makers, or pundits charged with making law or assessing the wisdom of legislative enactments." *Id.* We are concerned only with upholding the Alaska Constitution, which "takes precedence over the politics of the day and our own personal preferences." *Planned Parenthood of the Great Nw v. State*, 375 P.3d 1122, 1133 (Alaska 2016) (citing Alaska Const. art. XII, § 5; *Malone*, 650 P.2d at 356).

arguments to us that they made to the superior court and emphasizing what they contend is the sound public policy behind Alaska's nearly 40-year-old dividend program.

The narrow question before us is whether the 1976 amendment to the Alaska Constitution exempted the legislature's use of Permanent Fund income from the Constitution's anti-dedication clause. The answer cannot be found by weighing the merits of the dividend program or by examining the statutory dividend formula. The answer is found only in the language of the Alaska Constitution. And, as we explain below, the answer is no — the 1976 amendment did not exempt the legislature's use of Permanent Fund income from the Constitution's anti-dedication clause. Although the superior court did not reach this question, the court's ultimate conclusion nonetheless is correct: The legislature's use of Permanent Fund income is subject to normal appropriation and veto budgetary processes. We affirm the superior court's decision on this alternative ground.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

In 1976 voters approved an amendment to the Alaska Constitution creating the Alaska Permanent Fund (Permanent Fund) and dedicating to it certain state revenues.[3] To permit the revenue dedication, article IX, section 7 — an anti-dedication clause providing that "[t]he proceeds of any state tax or license shall not be dedicated to any special purpose" — was modified to add an exception "as provided in section 15 of this article."[4] And article IX, section 15 was added, as follows:

> At least twenty-five per cent of all mineral lease rentals, royalties, royalty sale proceeds, federal mineral revenue

---

[3]     *See* 1976 House Joint Resolution No. 39 (S.C.S. C.S.S.S. H.J.R. Res am S 39); *see also* Alaska Const. art. IX, §§ 7, 15.

[4]     Alaska Const. art. IX, § 7.

sharing payments and bonuses received by the State shall be placed in a permanent fund, the principal of which shall be used only for those income-producing investments specifically designated by law as eligible for permanent fund investments. All income from the permanent fund shall be deposited in the general fund unless otherwise provided by law.[5]

The new section's last sentence — regarding Permanent Fund income — is the primary focus of this decision.

A constitutional amendment was required to create and dedicate revenues to the new Permanent Fund because Alaska's constitutional convention delegates, the original framers of the Alaska Constitution, believed that "the dedication of revenues" was "a fiscal evil,"[6] largely because it failed "to preserve control of and responsibility for state spending in the legislature and the governor."[7] The 1976 amendment's framers and voters chose to make an exception to this general prohibition by dedicating constitutionally enumerated revenues to the principal of the new Permanent Fund. The twin goals behind this exception to the anti-dedication clause were: (1) saving for the future and (2) preventing wasteful spending of the oil and mineral revenue then expected to "flood" the state.[8]

---

[5] Alaska Const. art. IX, § 15.

[6] *State v. Alex*, 646 P.2d 203, 209 (Alaska 1982) (quoting 6 Proceedings of the Alaska Constitutional Convention (PACC) App. V at 111 (Dec. 16, 1955)).

[7] *Sonneman v. Hickel*, 836 P.2d 936, 938 (Alaska 1992).

[8] 1976 House Journal 39-40; *see Williams v. Zobel*, 619 P.2d 448, 453 (Alaska 1980), *rev'd on other grounds*, *Zobel v. Williams*, 457 U.S. 55 (1982).

The Permanent Fund's principal is a dedicated fund that cannot be accessed without further amending the Alaska Constitution.[9] The principal is devoted to "income-producing investments" now managed by the Alaska Permanent Fund Corporation (APFC).[10] It appears that before 1982 a percentage of Permanent Fund income was deposited into the general fund, with some money set aside for a dividend program;[11] since 1982 Permanent Fund income has been deposited in what now is known as the earnings reserve account (earnings reserve), a separate Permanent Fund account managed by APFC.[12]

In 1980 the legislature decided to use Permanent Fund income to pay each eligible Alaskan a dividend based on length of residency.[13] But the United States Supreme Court ruled that this dividend plan violated federal constitutional equal

---

[9] *See* Alaska Const. art. IX, § 15 ("[T]he principal . . . shall be used only for . . . income-producing investments . . . .").

[10] Alaska Const. art. IX, § 15; AS 37.13.040 (establishing APFC "to manage and invest the assets of the [P]ermanent [F]und and other funds designated by law").

[11] Alaska Const. art. IX, § 15 ("All income from the permanent fund shall be deposited in the general fund unless otherwise provided by law."); ALASKA DEP'T OF REVENUE, REVENUE SOURCES FY 1984-1987: QUARTERLY UPDATE SEPTEMBER, 1984, at 10 (1984).

[12] AS 37.13.145(a) ("The earnings reserve account is established as a separate account in the [Permanent F]und. Income from the [Permanent F]und shall be deposited by [APFC] into the account as soon as it is received. Money in the account shall be invested in investments authorized under AS 37.13.120."). From 1982 to 1986 the income went into a Permanent Fund "undistributed income account." Ch. 81, § 9, SLA 1982.

[13] Ch. 21, § 2, SLA 1980.

protection rights,[14] and so the first Permanent Fund dividends of $1,000 each were not distributed until 1982.[15]

The general structure for Permanent Fund dividends is largely the same today as it is was 35 years ago; dividends are paid to eligible Alaska residents following a statutorily structured three-step formula. First, APFC calculates the "[i]ncome available for distribution," defined as 21% of the net income of both the Permanent Fund and the earnings reserve "for the last five fiscal years."[16] Second, 50% of the "income available for distribution" is transferred by APFC from the earnings reserve to a dividend fund, a separate state treasury account administered by the Department of Revenue (DOR).[17] Finally, DOR "determine[s] the value of each permanent fund dividend for that year by" dividing the amount available in the dividend fund by "the number of individuals eligible to receive a dividend payment."[18]

But since the dividend program's inception there has been uncertainty in the executive and legislative branches about the limits of the statement in the second sentence of article IX, section 15 that Permanent Fund income "shall be deposited in the

---

[14]     *Zobel v. Williams*, 457 U.S. 55, 65 (1982) ("We hold that the Alaska dividend distribution plan violates the guarantees of the Equal Protection Clause of the Fourteenth Amendment.").

[15]     Ch. 102, § 19, SLA 1982.

[16]     AS 37.13.140. This amount also "may not exceed net income of the fund for the fiscal year just ended plus the balance in the earnings reserve" to avoid depleting the earnings reserve. *Id.*

[17]     AS 37.13.145(b); *see also* AS 43.23.045(a) (establishing "[t]he dividend fund . . . as a separate fund in the state treasury").

[18]     AS 43.23.025(a)(1)-(3); *see* AS 43.23.005 (generally defining as eligible all Alaskans who have been "a state resident during the entire qualifying year," with certain exceptions).

general fund *unless otherwise provided by law*."[19]  Specifically, the uncertainty has concerned whether, in conjunction with the 1976 exemption to the article IX, section 7 anti-dedication clause, that phrase permits considering the dividend's statutory scheme a constitutionally permissible dedication of revenues not requiring annual legislative appropriations[20] for transfers from the earnings reserve to the dividend fund.[21]  The legislature has made an appropriation for the transfer from the APFC earnings reserve

---

[19]     Alaska Const. art. IX, § 15 (emphasis added).

[20]     *See* Alaska Const. art. IX, § 13 ("No money shall be withdrawn from the treasury except in accordance with appropriations made by law.").

[21]     *See, e.g.*, STATE OF ALASKA, DEP'T OF LAW, INFORMAL OP. ATT'Y GEN., 1983 WL 42491 (Mar. 10, 1983) ("The [P]ermanent [F]und['s] dividend fund established under AS 43.23.045 would arguably involve an unconstitutional dedication of state revenue if money were transferred to that fund from income of the permanent fund without an appropriation."); 1980 FORMAL OP. ATT'Y GEN. 3, at 8 ("Because of decisional law applying constitutional provisions which require disclosure of the principal objects and effects of amendments, the effect of the words, 'unless otherwise provided by law' may be quite limited.  Our reading of the decisional law on constitutional amendments leads us to the conclusion here that the legislature probably can provide by law for income from the fund to be automatically deposited back into the fund or distributed as dividends.  Both are part of the amendment's history and both are closely related to the fund itself.  Use of the income without annual appropriations for other purposes, say for loan programs or guarantees, has no close relationship to the fund itself and probably would not pass constitutional muster.  Indeed, it is possible that the Alaska Supreme Court could find that an appropriation is required under article IX, section 13, even for deposits to the fund and distributions of income.  We doubt this would occur, but it is possible."); Letter from Attorney Gen. Avrum M. Gross to Governor Jay S. Hammond (June 28, 1976) ("In the second section [of the proposed 1976 constitutional amendment], the legislature also added a proviso allowing itself to provide by law that income from the fund may be deposited in other than the general fund.  However, since the only exception to the dedicated-fund prohibition in sec. 7 is the new sec. 15, it would appear that the only other place the income may be deposited is in the permanent fund.").

to the DOR dividend fund every year since 1982, apparently to avoid potential conflicts with the Alaska Constitution's anti-dedication clause.

In May 2016 the legislature passed an appropriation bill that included an estimated $1.362 billion transfer from APFC's earnings reserve to DOR's dividend fund, consistent with prior practice and the statutory formula.[22] But in June Governor Bill Walker exercised his line-item veto power and reduced the estimated $1.362 billion transfer to $695.65 million.[23] The legislature met in July but did not vote to override the governor's veto.[24] This resulted in 2016 Permanent Fund dividend payments of $1,022 to eligible Alaskans, about half of what had been expected under the legislature's appropriation.

## B.    Proceedings

A current state senator, Bill Wielechowski, and two former state legislators, Rick Halford and Clem Tillion (collectively Wielechowski), brought suit against the State of Alaska and APFC (collectively the State). Relying on the second sentence of the Permanent Fund clause, Wielechowski sought a declaration that the dividend program statutes contain a constitutionally permissible revenue dedication "automatically" transferring prescribed revenues from the earnings reserve to the dividend fund without need for legislative appropriation and not subject to the governor's veto. The State opposed, arguing that the 1976 constitutional amendment created an anti-dedication clause exemption only for revenues going into the Permanent

---

[22]    Ch. 3, § 10, 4SSLA 2016; *see* AS 37.13.145(b).

[23]    *See* Alaska Const. art. II, § 15 (providing the governor "may, by veto, strike or reduce items in appropriation bills").

[24]    *See* Alaska Const. art. II, § 16 ("[A]ppropriation bills . . . , although vetoed, become law by affirmative vote of three-fourths of the membership of the legislature.").

Fund and not for revenues going out of the Permanent Fund. The State alternatively argued that even if the Alaska Constitution permits legislative dedication of Permanent Fund income, the statutory transfer from the earnings reserve to the dividend fund still must meet constitutional appropriation and veto requirements.

After expedited proceedings the superior court ruled that the earnings reserve revenue transfer to the dividend fund requires an appropriation and must survive a gubernatorial veto. The court did not decide whether the revenue transfer would be a "permissible dedication" under the Alaska Constitution. Emphasizing the governor's strong veto control over spending provided by the Alaska Constitution, the court stated "[i]t is unlikely that the proponents of the [P]ermanent [F]und would intend so drastic a change in the governor's role over the budget by such a vague vehicle" as the concluding sentence of the 1976 constitutional amendment creating the Permanent Fund. The court determined that "[w]hat makes the least sense is that the proponents of the permanent fund clause would exempt the income of the [P]ermanent [F]und from the threat of a gubernatorial veto without expressly stating that intention."

Wielechowski appeals. Three other "long-time Alaska residents who each filed for a 2016 Permanent Fund [d]ividend" filed an amicus brief supporting Wielechowski.

## III.   STANDARD OF REVIEW

"We review summary judgment rulings de novo and may affirm summary judgment on any basis appearing in the record."[25] "Questions of constitutional and statutory interpretation, including the constitutionality of a statute, are questions of law

---

[25]     *Seybert v. Alsworth*, 367 P.3d 32, 36 (Alaska 2016) (quoting *Angleton v. Cox*, 238 P.3d 610, 614 (Alaska 2010)).

to which we apply our independent judgment. We adopt the 'rule of law that is most persuasive in light of precedent, reason, and policy.' "[26]

## IV. DISCUSSION

### A. The Alaska Constitution Does Not Exempt Permanent Fund Income From The Constraints Of The Anti-Dedication Clause.

#### 1. Framework for interpreting the Alaska Constitution

We provided a framework for interpreting the Alaska Constitution in *Hickel v. Cowper*.[27] "Our analysis of a constitutional provision begins with, and remains grounded in, the words of the provision itself. We are not vested with the authority to add missing terms or hypothesize differently worded provisions . . . to reach a particular result."[28] We instead "look to the plain meaning and purpose of the provision and the intent of the framers."[29]

"Because of our concern for interpreting the constitution as the people ratified it, we generally are reluctant to construe abstrusely any constitutional term that has a plain ordinary meaning."[30] "Constitutional provisions should be given a reasonable and practical interpretation in accordance with common sense."[31] "[A]bsent some signs

---

[26]    *State v. Ketchikan Gateway Borough*, 366 P.3d 86, 90 (Alaska 2016) (footnote omitted) (quoting *Se. Alaska Conservation Council v. State*, 202 P.3d 1162, 1167 (Alaska 2009)) (citing *State v. Schmidt*, 323 P.3d 647, 655 (Alaska 2014)).

[27]    874 P.2d 922, 926-28 (Alaska 1994).

[28]    *Id.* at 927-28.

[29]    *Id.* at 926 (quoting *ARCO Alaska, Inc. v. State*, 824 P.2d 708, 710 (Alaska 1992)) (citing *Kochutin v. State*, 739 P.2d 170, 171 (Alaska 1987)).

[30]    *Id.*

[31]    *Id.* (quoting *ARCO Alaska*, 824 P.2d at 710) (citing *Kochutin*, 739 P.2d at
(continued...)

that the term at issue has acquired a peculiar meaning by statutory definition or judicial construction, we defer to the meaning the people themselves probably placed on the provision"[32] without "add[ing] 'missing terms' to the Constitution or . . . interpret[ing] existing constitutional language more broadly than intended by . . . the voters."[33] "Legislative history and the historical context, including events preceding ratification, help define the constitution."[34]

### 2. The anti-dedication clause

Prior to the 1976 constitutional amendment the anti-dedication clause stated: "The proceeds of any state tax or license shall not be dedicated to any special purpose . . . ."[35] Although a plain reading of "state tax or license" might have suggested otherwise, a contemporaneous attorney general opinion gave the 1976 legislature good reason to believe that "state tax or license" meant all state revenue.[36] And in 1982 we

---

[31]    (...continued)
171).

[32]    *Id.*

[33]    *Id.* at 927.

[34]    *State v. Ketchikan Gateway Borough*, 366 P.3d 86, 90 (Alaska 2016) (citing *State v. Alex*, 646 P.2d 203, 208 (Alaska 1982); *Hootch v. Alaska State-Operated Sch. Sys.*, 536 P.2d 793, 800, 804 (Alaska 1975)).

[35]    Alaska Const. art. IX, § 7 (amended 1976).

[36]    *See* 1975 FORMAL OP. ATT'Y GEN. 9, at 24 ("[I]t is our conclusion that the dedication of *any source of public revenue* . . . is limited by the state Constitution to those existing when the Constitution was ratified or required for participation in federal programs." (emphasis added)), *quoted in Alex*, 646 P.2d at 210.

confirmed in *State v. Alex* that the anti-dedication clause "prohibits the dedication of any source of revenue."[37]

We first explained in *Alex* how convention delegates considered "the dedication of revenues" to be "a fiscal evil."[38] We later expressed in *Sonneman v. Hickel* "that the reason for the prohibition [on dedications] is to preserve control of and responsibility for state spending in the legislature and the governor."[39] "Without earmarked funds, the constitutional framers believed that the legislature would be required to decide funding priorities annually on the merits of the various proposals presented."[40] And we explained more recently in *State v. Ketchikan Gateway Borough* that the anti-dedication clause helps "govern the legislature's and the governor's 'joint responsibility . . . to determine the State's spending priorities on an annual basis.' "[41]

---

[37] 646 P.2d at 210; *see also Se. Alaska Conservation Council v. State*, 202 P.3d 1162, 1170 (Alaska 2009) ("[T]he prohibition [on dedications] is meant to apply broadly. If only revenue collected as taxes or license fees were included, there would have been no need to expressly exempt 'all mineral lease rentals, royalties, royalty sale proceeds, federal mineral revenue sharing payments and bonuses received by the State' to ensure that placing those revenues in the Permanent Fund did not violate the constitution." (footnote omitted) (quoting Alaska Const. art. IX, § 15) (citing Alaska Const. art. IX, § 7)).

[38] 646 P.2d at 209 (quoting 6 PACC App. V at 111 (Dec. 16, 1955)).

[39] 836 P.2d 936, 938 (Alaska 1992).

[40] *Id.* at 938-39; *see also id.* at 939 ("They have to sell their viewpoint along with everybody else." (quoting 4 PACC 2367 (Jan. 17, 1956) (comments of Delegate Barrie White))).

[41] 366 P.3d 86, 101 (Alaska 2016) (alteration in original) (quoting *Simpson v. Murkowski*, 129 P.3d 435, 447 (Alaska 2006)); *see also id.* ("Through the dedicated funds clause, the delegates sought to avoid the evils of earmarking, which the delegates feared would 'curtail[] the exercise of budgetary controls and simply [would] amount[]

(continued...)

We repeat our prior statements, and those from the constitutional convention, to emphasize the significance of the anti-dedication clause to the state's budgetary framework. No party suggests that Permanent Fund income is not state revenue.[42] Our starting point must therefore be that the anti-dedication clause prohibits the dedication of Permanent Fund income unless the 1976 constitutional amendment exempted not only the dedication of enumerated revenues *into* the Permanent Fund, but also — as Wielechowski argues — the legislature's potential future, unspecified dedication of revenues *out* of the Permanent Fund.

### 3.    Wielechowski's arguments

Wielechowski contends that the 1976 constitutional amendment creating and dedicating revenues to the Permanent Fund also created legislative authority to dedicate Permanent Fund income. He first contends that the entire article IX, section 15 clause, including the second sentence, is explicitly exempt from the anti-dedication clause of article IX, section 7.[43] He then relies on the second sentence's language that "income from the [P]ermanent [F]und shall be deposited in the general fund *unless otherwise provided by law*."[44] He argues that the legislature is constitutionally permitted

---

**41**    (...continued)
to an abdication of legislative responsibility.' " (alterations in original) (quoting *Alex*, 646 P.2d at 209)).

**42**    *See* Alaska Const. art. IX, § 15 ("All income from the [P]ermanent [F]und shall be deposited in the general fund unless otherwise provided by law.").

**43**    Alaska Const. art. IX, § 7 ("The proceeds of any state tax or license shall not be dedicated to any special purpose, *except as provided in section 15 of this article* . . . ." (emphasis added)).

**44**    Alaska Const. art. IX, § 15 (emphasis added).

to dedicate Permanent Fund income to the dividend fund by statute, because that would be "provided by law."

Wielechowski contends that the framers of the 1976 constitutional amendment intended to provide future legislatures "maximum flexibility" in using the Permanent Fund's income, including the dedication of earnings.[45] Wielechowski also contends that the ballot language[46] and newspaper articles emphasizing future legislative flexibility bolster his position.[47] The State disagrees, arguing that the plain language of article IX, section 15 dedicates only specific revenues into the Permanent Fund principal, and that no history concerning either the purpose of the amendment's framers or the

---

[45] *See* 1976 House Journal 685 ("The purpose of the language in the last sentence of the resolution is to give future legislatures the maximum flexibility in using the fund's earnings — ranging from adding to fund principal to paying out a dividend to resident Alaskans."); *see also* Hearing on H.J.R. 39 Before the H. Fin. Comm., 9th Leg., 2d Sess. 02:53:30-02:54:37 (Feb. 21, 1976) (hereinafter Testimony of Sterling Gallagher), http://www.akleg.gov/ftr/archives/1976/HFIN/ H76R31-HFIN-760000.mp3 (testimony of Sterling Gallagher, Comm'r of Revenue) (discussing the possibility of using Permanent Fund income as "a pledge or dedication . . . for securities of the state"); Hearing on H.J.R. 39 Before the H. Fin. Comm., 9th Leg., 2d Sess. 00:02:41-00:03:56 (Feb. 21, 1976) (hereinafter Testimony of Jim Rhode), http://www.akleg.gov/ftr/ archives/1976/HFIN/ H76R32-HFIN-760000.mp3 (testimony of Jim Rhode) (discussing how Permanent Fund income "could be pledged in the bond covenants for the security of state agencies or general obligation bonds").

[46] DIV. OF ELECTIONS, SAMPLE GENERAL ELECTION BALLOT (1976) ("The income from the fund would be deposited in the State's General Fund and be available for appropriation for the State *unless law provided otherwise*." (emphasis added)).

[47] *See* Susan Andrews, *Lawmakers Would Shape Permanent Fund*, ANCHORAGE TIMES, Oct. 24, 1976, at A3 ("There are a number of possibilities for use of the earnings — and the legislature will decide those uses."); *Permanent Fund Raises Use Issue*, ANCHORAGE DAILY NEWS, Oct. 22, 1976 ("There have been many proposals for possible fund uses.").

information provided to the voters shows an intent to allow the legislature to dedicate Permanent Fund income.

We agree with the State. We conclude that the 1976 constitutional amendment does not allow the dedication of Permanent Fund income. We reach this conclusion based on the plain language of the anti-dedication and Permanent Fund clauses of the Alaska Constitution; contrary to Wielechowski's arguments, our review of the record concerning the framers' intent and voters' understanding only bolsters our conclusion. We address the latter two issues first solely for historical perspective before addressing the plain language analysis.

### a. Framers' intent

A permanent fund was proposed by then-Governor Jay Hammond to save for future generations a percentage of revenue generated from nonrenewable resources;[48] he also sought to curb wasteful government spending of expected increased revenues.[49] In the letter transmitting his proposal, Governor Hammond explained:

> I have introduced this resolution proposing a constitutional amendment because I believe strongly that the revenues from our non-renewable resources belong to future generations of Alaskans as well as ourselves. A permanent fund as I have proposed will set aside a modest portion of the proceeds from the exploitation of our non-renewable resources for investment in our future while leaving sufficient revenues for our present needs.[50]

---

[48] 1976 House Journal 39-40.

[49] *See Williams v. Zobel*, 619 P.2d 448, 453 (Alaska 1980), *rev'd on other grounds*, *Zobel v. Williams*, 457 U.S. 55 (1982).

[50] 1976 House Journal 40.

Although Governor Hammond's permanent fund language was subsequently modified by the legislature, the overall structure of his proposed amendment to the Alaska Constitution remained the same: (1) a percentage of revenue from nonrenewable resources would be placed into a permanent fund; (2) the permanent fund principal could be used only for income-producing investments; and (3) the legislature would have access to the permanent fund income.[51]

The House amended the permanent fund clause's treatment of income to include an alternative to mandatory general fund deposits: "All income from the permanent fund shall be deposited in the general fund *unless otherwise provided by law*."[52] Although there was some discussion about how the phrase "unless otherwise provided by law" might allow income from the fund to be used as security for bonds,[53]

---

[51]    *Compare* 1976 House Joint Resolution No. 39 (S.S.H.J.R. 39) (substituting in H.J.R. 39 by request of the governor: "Ten per cent of all mineral lease rentals, royalties, royalty sale proceeds, revenue sharing payments, bonuses, and mineral production taxes received by the state shall be placed in a permanent fund, the principal of which shall be used only for income investments. The legislature may appropriate additional amounts to the permanent fund which shall become a part of the principal of the fund. All income from the permanent fund shall be deposited in the general fund."), *with* Alaska Const. art. IX, § 15 ("At least twenty-five per cent of all mineral lease rentals, royalties, royalty sale proceeds, federal mineral revenue sharing payments and bonuses received by the State shall be placed in a permanent fund, the principal of which shall be used only for those income-producing investments specifically designated by law as eligible for permanent fund investments. All income from the permanent fund shall be deposited in the general fund unless otherwise provided by law.").

[52]    1976 House Joint Resolution No. 39 (C.S.S.S. H.J.R. am 39) (emphasis added).

[53]    *See, e.g.*, Testimony of Sterling Gallagher, *supra* note 45 (discussing how dedicating income from permanent fund "could be a great enhancement" as security for "debt service"); Testimony of Jim Rhode, *supra* note 45 (opining that "the phrase 'unless
(continued...)

a joint report from the House Judiciary and Finance Committee chairs stated only that "[t]he purpose of the language in the last sentence of the resolution is to give future legislatures the maximum flexibility in using the Fund's earnings — ranging from adding to Fund principal to paying out a dividend to resident Alaskans."[54] After that joint report, language was added in the Senate State Affairs Committee specifically referencing dedications — to the fund's principal, but not of the fund's income[55] — but the language was later removed in the next committee of referral.[56]

There was virtually no discussion by the 1976 constitutional amendment's framers about dedicating Permanent Fund income, and they had reason to know that the fund's income would be state revenue subject to the constitution's anti-dedication clause.[57] The only relevant discussions were by non-legislators — primarily concerning the possibility of using fund income as security for bonds — and Wielechowski points

---

[53] (...continued)
otherwise directed by the legislature' . . . would be a sufficient legal peg so that income from the permanent fund could be pledged in the bond covenants for the security of state agencies or general obligation bonds").

[54] 1976 House Journal 685.

[55] 1976 House Joint Resolution No. 39 (S.C.S. C.S.S.S.H.J.R. 39) ("The legislature may *dedicate* additional proceeds both as to source and percentage which shall become a part of the principal of the fund. Any additional *dedication* may be revoked by the legislature, but revocation may not make the principal amount in the permanent fund subject to appropriation. Other income from the permanent fund shall be deposited in the general fund." (emphasis added)).

[56] *See* 1976 House Joint Resolution No. 39 (S.C.S. C.S.S.S.H.J.R. Res. 39).

[57] *See* 1975 FORMAL OP. ATT'Y GEN. 9, at 24 ("[I]t is our conclusion that the dedication of any source of public revenue . . . is limited by the state Constitution to those existing when the Constitution was ratified or required for participation in federal programs.").

to no statement by any legislator during any legislative hearing indicating an intent to give the legislature broad authority to dedicate Permanent Fund income. There was little evident recognition, let alone the robust discussion that would be expected, for what Wielechowski now posits was a sweeping constitutional change and a consequent sweeping change to the state's budgetary framework. We conclude there is insufficient legislative history to suggest that the framers of the 1976 constitutional amendment intended to allow dedication of Permanent Fund income.

### b.      Voters' intent

The voters approving the 1976 constitutional amendment certainly understood it would restructure the Alaska Constitution to allow the diversion of state revenues into the Permanent Fund, which then would generate income the legislature could use in future years. But looking to "any published arguments . . . to determine what meaning voters may have attached to the [proposed constitutional amendment],"[58] we see no evidence that voters would have understood the amendment to also permit future legislative dedications of Permanent Fund income. The ballot initiative language did not expressly say the fund's income could be dedicated.[59] A newspaper column by

---

[58]      *See Alaskans for a Common Language, Inc. v. Kritz*, 170 P.3d 183, 193 (Alaska 2007) (citing *Falcon v. Alaska Pub. Offices Comm'n*, 570 P.2d 469, 472 n.6 (Alaska 1977)); *see also id.* at 192 ("While we often look to legislative intent to construe the meaning of ambiguous statutes, we take a slightly different approach when interpreting initiatives enacted by the voters." (citing *Falcon*, 570 P.2d at 472 n.6)).

[59]      SAMPLE GENERAL ELECTION BALLOT, *supra* note 46 ("This proposal would amend Article IX, Section 7 (Dedicated Funds) and add a new section to Article IX, Section 15 (Alaska Permanent Fund) of the Alaska Constitution. It would establish a constitutional permanent fund into which at least 25 percent of all mineral lease rentals, royalties, royalty sale proceeds, federal mineral revenue sharing payment[s] and bonuses received by the State would be paid. The principal of the fund would be used only for income-producing investments permitted by law. The income from the fund would be
(continued...)

Governor Hammond advocating for the amendment's passage days before the election gave no indication the fund's income could be dedicated.[60] The sponsor statement for the amendment did not say the fund's income could be dedicated.[61] Published news articles did not say the fund's income could be dedicated, and often they suggested the opposite.[62] Wielechowski points to nothing explicitly asking voters to pass the 1976

---

[59] (...continued)
deposited in the State's General Fund and be available for appropriation for the State unless law provided otherwise.").

[60] Jay Hammond, Opinion, *The Governor's Point of View*, ANCHORAGE TIMES, Oct. 27, 1976, at 6 ("[M]ake no mistake, it is for the people, not the governor, nor the legislature singly to determine how your savings are invested and the interest used."); *see id.* ("The income from the Permanent Fund will be available for general appropriation by the legislature, but the principal of the fund may not be touched. It could only be removed from the fund by another constitutional amendment.").

[61] ALASKA STATE CHAMBER OF COMMERCE, STATEMENT IN FAVOR OF PROPOSITION NO. 2: ALASKANS SHOULD STRONGLY SUPPORT THE ESTABLISHMENT OF A "PERMANENT FUND" (1976) ("While it is to be hoped that such a fund may contribute to cutting cost or, at least, holding the line on state spending, its major value would be that it would require our elected officials to pause, reflect and research any proposal before blindly authorizing expenditure of taxpayers' monies. This would provide needed time for the press and the public to also be aware of the pending project and its merit, instead of being out of public view and hidden in the spending pattern of normal day-to-day operations. Projects invested in with sources from the 'Permanent Fund' could help broaden Alaska's narrow based economy and bring more stability to our State.").

[62] *See 2 Plans, 1 Fund*, ANCHORAGE DAILY NEWS, Apr. 21, 1976 ("Exactly how the permanent fund is set up would be the job of future legislatures. Our elected representatives, by law, would prescribe how the money is to be invested. That may demand a different application of the fund from one year to the next, but flexibility to meet changing demands is guaranteed by current legislation. Likewise, future legislators would be able to decide what to do with the considerable earnings of the fund. Perhaps that extra dividend will be needed sometimes for general operating expense; at other times, perhaps the dividends could be simply reinvested in the fund itself. The freedom
(continued...)

constitutional amendment because the amendment would permit, even in part, legislative dedication of the fund's income.

We are not persuaded that newspaper language Wielechowski points to shows voters understood the 1976 constitutional amendment would give the legislature the ability to dedicate Permanent Fund income;[63] nothing in that language necessarily points to dedication of revenues rather than appropriation in the normal course. And as with his argument about the framers' intent, Wielechowski's ballot summary argument is based on implicit suggestion and inferred intent, gleaned here from the ballot summary's statement that Permanent Fund income would be deposited in the general fund and "available for appropriation . . . unless law provided otherwise."[64] It is a far leap to conclude voters understood and intended that phrase to give the legislature broad power to dedicate Permanent Fund income for any purpose and any duration with little restriction. Surely there would have been some public discourse about a grant of such

---

[62]     (...continued)
to choose must be built into the fund."); *Permanent Fund Raises Use Issue*, *supra* note 47 ("A frequent argument against the fund comes from opponents who say dedicated funds are insensitive to future, unpredictable needs. What if there is some unexpected need in the future, they ask, and much of the state's assets are locked up in the fund and can't be reached for solutions? To that complaint, proponents answer that the flexibility of allowing future legislatures to decide on precise uses will prevent the 'locked up' circumstance.").

[63]     *See* Andrews, *supra* note 47, at A3 ("There are a number of possibilities for use of the earnings — and the legislature will decide those uses."); Hammond, *supra* note 60, at 6 ("[M]ake no mistake, it is for the people, not the governor, nor the legislature singly to determine how your savings are invested and the interest used."); *Permanent Fund Raises Use Issue*, *supra* note 47 ("There have been many proposals for possible fund uses. They range from paying direct dividends to Alaskans to using the money to underwrite such vast projects as hydroelectric dams.").

[64]     SAMPLE GENERAL ELECTION BALLOT, *supra* note 46.

sweeping legislative authority; its absence, like the absence of discussion in the 1976 legislature, is telling.

### c.    Plain meaning

The second sentence of article IX, section 15 states: "All income from the permanent fund shall be deposited in the general fund unless otherwise provided by law."[65] The phrase "unless otherwise provided by law" does not plainly allow the legislature to dedicate Permanent Fund income; the phrase appears to simply provide an alternative to depositing the income into the general fund. And this is precisely what the legislature has done by creating the unique earnings reserve: (1) an account existing outside of the general fund; (2) appropriable by the legislature; (3) managed by APFC; (4) invested in income-producing assets; and (5) as the State argues, treated differently than other state revenues because of public expectations.[66] The second sentence of the

---

[65]    Alaska Const. art. IX, § 15.

[66]    *See* AS 37.13.145(a); *Hickel v. Cowper*, 874 P.2d 922, 934 (Alaska 1994) (explaining how earnings reserve works).

In *Hickel* we considered, on an expedited basis, what funds were "available for appropriation" within the meaning of article IX, section 17(b) of the Alaska Constitution, concerning the Constitutional Budget Reserve. *Hickel*, 874 P.2d at 925-26. By defining and identifying appropriable state funds we helped determine when the legislature could "withdraw from the budget reserve fund by a simple majority vote." *Id.* at 923. And we held that the balance of the earnings reserve contains appropriable funds within the meaning of article IX, section 17 "because appropriations may be made from it and it is not subject to expenditure without legislative action." *Id.* at 935.

In deciding that the balance of the earnings reserve was "available for appropriation" we also looked at the dividend transfer provisions. *See id.* at 934 (discussing AS 37.13.145(b)). Apparently looking solely to the transfer statute and not appreciating that the legislature had been appropriating transfers throughout the years, we stated that the transfers from the earnings reserve to the dividend fund occurred

(continued...)

Permanent Fund clause permits the creation and use of the earnings reserve for deposit of the fund's income pending appropriation; it does not give the legislature the authority to dedicate that income.

Nor can the plain meaning of the exception added to the anti-dedication clause be understood to grant the legislature such broad authority. It exempts dedications "as *provided in* section 15," not as *permitted by* that section.[67] "Provided" here is synonymous with "supply, furnish."[68] A dedication is quite explicitly *supplied* in the first sentence of article IX, section 15: "At least twenty-five per cent of all [specific mineral revenues] . . . *shall be placed* in a [P]ermanent [F]und."[69] Even the most expansive reading of the clause's second sentence — "unless otherwise provided by law" — could be understood only to *permit* further dedications, not to *provide* them.

Interpreting the 1976 constitutional amendment to allow dedications of Permanent Fund income would create an anti-dedication clause exception that would swallow the rule. We remain "unwilling to add 'missing terms' to the Constitution or to interpret existing constitutional language more broadly than intended by . . . the

---

[66] (...continued)
"automatically." *Id.* ("A percentage of the money in the [earnings] reserve . . . is automatically transferred to the dividend fund at the end of each fiscal year." (citing AS 37.13.145(b))). But we were not asked to decide whether the transfer was a constitutionally permissible dedication of Permanent Fund income, and our previous characterization of the action as "automatic[]" does not control here. Our decision today reinforces our holding in *Hickel* that the earnings reserve "is available for appropriation." *Id.*; *see also id.* at 935.

[67] Alaska Const. art. IX, § 7 (emphasis added).

[68] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1827 (1966).

[69] Alaska Const. art. IX, § 15 (emphasis added).

voters."[70]    Without an explicit exception to the anti-dedication clause, we will not "abstrusely" interpret the Permanent Fund clause to permit the dedication of its income.[71] Whether any prior legislature or administration treated the dividend program as if it were a dedication has no bearing on our analysis; what matters is what the Alaska Constitution says.[72]

The plain language of the 1976 constitutional amendment creating the Permanent Fund does not exempt Permanent Fund income from the constraints of the anti-dedication clause.  We affirm the superior court on this alternative ground,[73] although the conclusion that a revenue transfer from the earnings reserve to the dividend fund requires an appropriation and must survive a gubernatorial veto flows naturally from our decision.  Absent another constitutional amendment, the Permanent Fund dividend program must compete for annual legislative funding just as other state programs.[74]

---

[70]    *Hickel*, 874 P.2d at 927.

[71]    *Id.* at 926.

[72]    *See id.* at 925 & n.7.

[73]    *See Seybert v. Alsworth*, 367 P.3d 32, 36 (Alaska 2016) ("We review summary judgment rulings de novo and may affirm summary judgment on any basis appearing in the record." (quoting *Angleton v. Cox*, 238 P.3d 610, 614 (Alaska 2010))). We therefore do not decide and express no opinion on the specific ground ruled upon by the superior court.

[74]    *See Sonneman v. Hickel*, 836 P.2d 936, 938-39 (Alaska 1992) ("[T]he constitutional framers believed that the legislature would be required to decide funding priorities annually on the merits of the various proposals presented.").

**B.** **The Governor Validly Exercised Veto Authority When Reducing The Amount Of Funds For Transfer.**

Wielechowski also challenges the manner in which Governor Walker exercised his veto power, arguing that he improperly "struck descriptive language, resulting in an [unconstitutional] infringement on legislative power." The State contends that because Governor Walker did not alter the appropriation's purpose, he properly exercised his veto authority.

We conclude that Governor Walker validly exercised his constitutional veto authority when reducing the transfer amount from the earnings reserve to the dividend fund. After the governor's veto struck existing language and inserted a new appropriation amount, the legislature's transfer authorization stated:

> The amount ~~authorized under AS 37.13.145(b)~~ for transfer by the Alaska Permanent Fund Corporation on June 30, 2016, ~~estimated~~ to be $~~1,362,000,000,~~ 695,650,000 is appropriated from the earnings reserve account (AS 37.13.145) to the dividend fund (AS 43.23.045(a)) for the payment of permanent fund dividends and for administrative and associated costs for the fiscal year ending June 30, 2017.[75]

In *Alaska Legislative Council v. Knowles* we held that the governor has no authority to strike descriptive language in appropriation bills.[76] Although the governor has authority to "strike or reduce" "a sum of money dedicated to a particular purpose,"[77] the governor does not have authority to "distort the legislative intent, and in effect create legislation inconsistent with that enacted . . . by the careful striking of words, phrases,

---

[75]     Ch. 3, § 10, 4SSLA 2016 (as amended).

[76]     21 P.3d 367, 371-75 (Alaska 2001).

[77]     *Id.* at 371; *see* Alaska Const. art. II, § 15.

clauses or sentences."[78]  Stated differently, "[t]he governor can delete and take away, but the constitution does not give the governor power to add to or divert *for other purposes* the appropriations enacted by the legislature."[79]

Governor Walker properly vetoed a portion of the transfer to the dividend fund by striking some language from the 2016 appropriations bill.  Unlike the *Alaska Legislative Council* governor's attempt to veto language placing restrictions on his spending,[80] Governor Walker struck only language concerning the legislature's estimated 2016 transfer amount.  In doing so Governor Walker did not alter the legislature's purpose; the appropriation bill still stated that the transfer was "for the payment of permanent fund dividends and for administrative and associated costs for the fiscal year ending June 30, 2017."[81]

Wielechowski argues that the governor had no authority to strike the "descriptive" reference to AS 37.13.145(b) because he effectively vetoed a statute.  But we addressed a similar argument in *Simpson v. Murkowski*.[82]  In *Simpson* we concluded that the governor had constitutional authority to veto an appropriation for longevity

---

[78]     *Alaska Legislative Council*, 21 P.3d at 373 (quoting *State ex rel. Sego v. Kirkpatrick*, 524 P.2d 975, 981 (N.M. 1974)) (citing *Rush v. Ray*, 362 N.W.2d 479, 482 (Iowa 1985); *Welden v. Ray*, 229 N.W.2d 706, 713 (Iowa 1975)).

[79]     *Id.* at 371 (emphasis added).

[80]     *See id.* at 370-71 (indicating governor struck language making appropriation contingent on a salary cap for "employees . . . located outside Alaska" (quoting ch. 98, § 6, SLA 1997; ch. 100, §§ 47, 70, SLA 1997)).

[81]     Ch. 3, § 10, 4SSLA 2016 (as amended).

[82]     129 P.3d 435, 446-47 (Alaska 2006).

bonus payments even though a statute mandated the payments.[83]   Governor Walker likewise validly exercised his veto authority to reduce an appropriation despite a seemingly mandatory statute.

Because:  (1) Governor Walker struck only language related to the amount of funds to be transferred; (2) the language in the appropriation bill post-veto would make less sense if only the number had been struck and reduced; and (3) language about the transfer's purpose remained, we conclude that Governor Walker properly exercised his veto authority.

## V.   CONCLUSION

Because the plain language of article IX, sections 7 and 15 does not permit the dedication of Permanent Fund income, and because Governor Walker properly exercised his veto authority when reducing the legislatively authorized transfer from the earnings reserve to the dividend fund, we AFFIRM the superior court's decision in favor of the State of Alaska and the Alaska Permanent Fund Corporation.

---

[83]      *Id.*